**FIDELITY TELEVISION, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee, RKO General, Inc., Intervenor.**

No. 73–2213.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 23, 1974.

Decided March 6, 1975.

Rehearing Denied June 30, 1975.

---

Walter H. Sweeney, Washington, D. C., with whom Edward P. Morgan, Washington, D. C., was on the brief, for appellant.

Joseph A. Marino, Associate Gen. Counsel, F. C. C., with whom Ashton R. Hardy, Gen. Counsel, and Joseph Volpe III, Counsel, were on the brief, for appellee. John W. Pettit, Gen. Counsel, F. C. C., at the time the record was filed, also entered an appearance for appellee.

Harold David Cohen, Washington, D. C., with whom John J. Duffy, New York City, was on the brief, for intervenor, RKO General, Inc. J. Laurent Scharff, Washington, D. C., also entered an appearance for intervenor RKO General, Inc.

Before LEVENTHAL and ROBB, Circuit Judges, and DAVIS *, Judge, United States Court of Claims.

DAVIS, Judge:

Nearly ten years ago, intervenor RKO General, Inc. filed an application for a three-year renewal of its license to operate KHJ–TV, Channel 9 in Los Angeles. Thus began a long saga which we may not even end today by affirming the Commission's decision in favor of RKO.[1]

## I

RKO, a wholly-owned subsidiary of General Tire and Rubber Company, has operated KHJ since 1951. Joint Appendix at 52. Under the Federal Communications Commission's license-renewal scheme, see 47 C.F.R. § 73.630 (1965), this license came up for three-year renewal with those of other California licensees in 1965, and RKO filed an application for renewal on August 31, 1965. Two months later, on October 25, 1965, appellant Fidelity Television, Inc. filed an application for a construction permit to build a station at Norwalk, California, also to operate on Channel 9 and to blanket the same area.[2] As appli-

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1970).

1. Under the "holdover" provisions of the Federal Communications Act and the Commission's rules, RKO has been operating the station in the interim. 47 U.S.C. § 307(d) (1970); 47 C.F.R. § 1.62(a)(1) (1973). The history of this case emphasizing the interplay of decisions by the F.C.C. and this court is set out in our earlier decision in Fidelity Television, Inc. v. F. C. C., 163 U.S.App.D.C. 441, 502 F.2d 443 (1974).

2. A construction permit is a necessary prerequisite to the licensing of a new station, and except in rare cases, it is also a guarantee of a licensee to operate the station once constructed. 47 U.S.C. § 319 (1970); 47 C.F.R. § 1.68 (1973). While Channel 9 is allocated to Los Angeles under the Commission's overall television allocation scheme, 47 C.F.R. § 73.606 (1973), Commission rules permit a licensee to operate the station from anywhere within 15 miles of the city of license. 47 C.F.R. § 73.607(b) (1973). Norwalk is within 15 miles of Los Angeles.

cations for mutually exclusive stations, the requests of RKO and Fidelity were designated for a comparative hearing by the Commission on June 8, 1966. Joint Appendix at 1–2; see Ashbacker Radio Co. v. F. C. C., 326 U.S. 327, 333, 66 S.Ct. 148, 90 L.Ed. 108 (1945). In setting the applications for a comparative hearing, the Commission as was its practice, limited the questions to be considered to the so-called "standard comparative issues," i. e., which of the proposals would better serve the public interest, and which of the applications should be granted. These standard issues did not include programming and certain other factors.[3]

The Commission's rules provide, however, that an applicant might petition the Review Board for an enlargement of the issues so that evidence could be presented on, e. g., character or programming. See 47 C.F.R. § 1.229 (1973). Fidelity, on June 27, 1966, filed such a petition, requesting the addition of three issues: which applicant would provide for a more fair, efficient and equitable distribution of television services; the "service philosophy" of each applicant;[4] and the significant differences in programming proposed by each applicant. Joint Appendix at 44. The F.C.C.'s Review Board denied Fidelity's petition on October 27, 1966, and the Commission then rejected Fidelity's application for review of the Board's order on December 29, 1966. Ibid. at 161–63. The compara-

tive hearing on the two proposals, on the standard comparative issue only, opened on February 27, 1967, and the record was closed for the first time on June 15, 1967. Ibid. at 45.

This proceeding did not, however, simply run its ordinary course through the hearing examiner[5] and the Commission after the hearing opened. On March 6, 1967, the Commission released a decision in Chapman Radio & Television Co., a four-sided comparative proceeding for assignment of a new television station in Homewood, Alabama. 7 F.C.C.2d 213 (1967). One of the competitors had requested the addition of a programming issue, and the Review Board had denied the request. The Commission took the opportunity to clarify the relationship between its general policy and the incorporation of a programming issue, stating that "a proponent of the programing issue should be required to make a prima facie showing that there are significant differences in the programing proposed and should relate his claimed substantial superiority in program planning to his ascertainment of community needs." 7 F.C.C.2d at 215. Chapman was then remanded to the Review Board to consider whether a programming issue should be added under the clarified standard. Ibid.

On March 9, 1967, Fidelity filed a petition with the Commission requesting that it itself add programming and

Fidelity proposed to construct the station at Norwalk because it wished to orient programming of the channel to the "Southland", an area described in Fidelity's Petition to Enlarge Issues as the area in Los Angeles County lying to the south and east of the city and Orange County. Joint Appendix at 198.

3. The theory of the standard comparative issue is that the Commission determines before setting the case for a hearing that each applicant has the minimum character, legal, financial, and technical capability to operate the station in the public interest. The purpose of the comparative hearing is to determine, on that basis, which would serve the public interest better. See Anthony, Towards Simplicity and Rationality in Comparative Broadcast Licensing Proceedings, 24 Stan.L.Rev. 1, 33–34 (1971) [cited as Anthony]. Under this theory, an applicant's ability to produce the program-

ming set out on his application is considered a non-comparative financial issue, and is not ordinarily deemed relevant in the comparative proceeding. See McClatchy Broadcasting Co., 19 F.C.C. 343, 375 (1954); National Broadcasting Co., 21 F.C.C.2d 611, 625–27 (1970).

4. The "service philosophy" issue deals with an applicant's intention to direct his programming to, or primarily to, only a part of the area to which his signal reaches. See Central Coast Television, 35 F.C.C. 259 (1963); Petersburg Television Corp., 19 F.C.C. 451 (1954).

5. The title of hearing examiner was changed to Administrative Law Judge effective September 6, 1972. 37 Fed.Reg. 18034 (1972). Since all decisions in this case at levels below the Commission itself had been made before 1972, the title "hearing examiner" will be used in this opinion.

needs-ascertainment [6] issues on the basis of *Chapman,* or that it remand to the Review Board for reconsideration in the light of *Chapman.* This application was denied on July 12, 1967, on the ground that Fidelity had not offered any new data and the data on which it had originally relied did not amount to the *"prima facie* showing" required under *Chapman.* Joint Appendix at 171–75. Fidelity then filed a further petition for clarification with the Review Board, seeking to ascertain that tribunal's position on whether it had in effect applied the *Chapman* standards initially. This was denied on September 22, 1967. *Ibid.* at 176–79.

Concurrently, on March 2, 1967, the Department of Justice filed suit in the United States District Court for the Northern District of Ohio against the General Tire and Rubber Company, Aerojet-General Corporation, A. M. Byers Company, and RKO General, Incorporated (the latter three companies were subsidiaries of General Tire). United States v. General Tire & Rubber Co., No. C–67–155 (N.D.Ohio, filed Mar. 2, 1967). This action alleged that the four companies had violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, in that they had, among other things, engaged "in a combination and conspiracy to utilize reciprocity whereby the purchasing power of all of said defendants is used to coerce and persuade certain actual and potential suppliers of the defendants to purchase tires, wrought iron products,

advertising time and other products and services from said defendants, in unreasonable restraint of . . . trade and commerce; . . ." Complaint at 6, United States v. General Tire & Rubber Co., *supra.*

Responding to this new development, Fidelity filed with the Review Board, on March 8, 1967, a petition to enlarge the issues to be considered at the comparative hearing to include a determination

> in light of all the facts and circumstances surrounding the Complaint filed by the United States of America on March 2, 1967, against General Tire and Rubber Company, . . . whether RKO General, Inc., is qualified to be a licensee of the facility for which it is applying herein, or alternatively, whether such matters bear upon the comparative qualifications of RKO General, Inc.; . . . [Joint Appendix at 164.]

The Board denied the petition on June 20, 1967, saying that Fidelity's allegations of wrongdoing were not specific enough to warrant the addition of a "disqualifying character issue," but that "relevant facts and circumstances forming bases for the civil suit—particularly as they relate to RKO's broadcast practices—can be adduced by Fidelity under the standard comparative issue." Joint Appendix at 167–68. The Board also said that any grant to RKO would be conditioned on the Commission's right to reopen the case should the outcome of the antitrust suit be unfavorable to RKO.[7] *Ibid.* at 169.

---

6. A "needs ascertainment" issue relates to the manner and quality of an applicant's efforts to discover community needs, as required by the Commission *En Banc* Programming Inquiry, 44 F.C.C. 2303, 2314 (1960) and Section IV of FCC Form 301, Application for Authority to Construct a New Broadcast Station, etc. The standards for sufficient needs-ascertainment were substantially upgraded effective January 1, 1967 for television license renewals, after the renewal application at issue here was filed, and again in 1971. *See* Amendment of Section IV (Statement of Program Service) of Broadcast Application Forms 301, 303, 314, and 315, 5 F.C.C.2d 175, 181 (1966); Primer on Ascertainment of Community Problems by

Broadcast Applicants, etc., 27 F.C.C.2d 650 (1971). *Compare* Saul M. Miller, 4 F.C.C.2d 150 (1966) *with* Minshall Broadcasting Co., 11 F.C.C.2d 796, 797 (1968), *and* Pleasant Broadcasting Co., 40 F.C.C.2d 582, 585–86 (1973), aff'd, 164 U.S.App.D.C. 202, 504 F.2d 271 (1974).

7. The antitrust action was concluded by a consent decree, with judgment entered on October 21, 1970. The judgment stated that it was entered without "constituting evidence or admission by any party with respect to any issue of fact or law." Final Judgment at 1, United States v. General Tire & Rubber Co, *supra.* It did, however, restrain General Tire and its subsidiaries, including RKO, from engaging in the

All requests for additional issues having thus been disposed of, the comparative hearing continued on the standard comparative issue only, with Fidelity providing only a "superficial" inquiry into RKO's trade practices. Joint Appendix at 180. The record was, as noted above, closed for the first time on June 15, 1967, and the hearing examiner issued his proposed findings in September, 1967. *Ibid.* On February 9, 1968, however, Fidelity petitioned the examiner to reopen the record to receive newly discovered evidence—depositions taken in the Government's antitrust suit. The hearing examiner reopened the record, but cautioned that "It is not being reopened as a repository for the record in the Ohio anti-trust suit. . . . Petitioner asks that the record be reopened for the purpose of taking evidence on the reciprocal trade practices of RKO. With the caveat that such evidence must be patently germane to RKO's stewardship of KHJ–TV that language is adopted as words limiting the scope of future hearing." Joint Appendix at 181–82.[8] The record was closed for good on August 26, 1968, and the initial decision of the hearing examiner came down on August 13, 1969.

The examiner's decision, without an overabundance of enthusiasm, recommended that RKO's application for renewal be denied and Fidelity be granted a construction permit to build a station to take over Channel 9. Joint Appendix at 151, 153. He found that General Tire and RKO had substantially contributed to the development of broadcast technology and had the capacity to run a good station. *Ibid.* at 137–41. However, he also found that KHJ's past performance in programming and community relations, particularly in the station's concentration on presenting old films and ignoring community criticism of excessive violence in some of the movies, was poor. *Ibid.* at 143. On the other hand, he gave Fidelity a demerit for an integration-of-ownership-and-management proposal which he felt was created just to win the license and would not be implemented. *Ibid.* at 150–51. Fidelity, however, was found superior in local ownership, in community-needs-ascertainment, and in providing for diversification of ownership of the mass media. *Ibid.* at 149. The examiner berated General Tire's anticompetitive practices, but did not give RKO a special character demerit for them. *Ibid.* at 144–46, 148. Finding "neither applicant is any bargain as a broadcast licensee," the examiner chose to give Fidelity a chance to improve on RKO's performance. *Ibid.* at 151, 153.

Soon after the release of this initial decision, another RKO station, WNAC–TV, Boston, came up for renewal. Upon the filing of two other mutually exclusive applications for construction permits, the Commission, on December 11, 1969, designated the three applications for a comparative hearing. RKO General, Inc. (WNAC–TV), FCC 74D–36 at 2 (released June 21, 1974). Included in the hearing order was an "anticompetitive" issue much like that added in the current case after the record was closed. *Ibid.* at 3. On January 8, 1971, the Commission's Broadcast Bureau filed a petition with the Commission asking that the KHJ record be reopened and consolidated with the WNAC record on the anti-

practices of reciprocity charged in the complaint. *Ibid.* at 2–5. In its decision in this case, the Commission determined that this outcome was not unfavorable to RKO, and that the Review Board's condition had therefore become "a nullity." Joint Appendix at 5.

8. While the petition to reopen the record was pending before the hearing examiner, Fidelity filed on February 19, 1968, a second request with the Review Board for enlargement of the issues to include a determination whether RKO should be disqualified or assessed a demerit because of anticompetitive practices.

Joint Appendix at 183–85. The Board denied Fidelity's petition on May 10, 1968. *Ibid.* The Commission's decision on review, released September 9, 1968, found that the hearing examiner's decision to reopen the record had provided Fidelity with the opportunity to submit evidence on RKO's anticompetitive conduct, so that no further relief by way of reopening the record was required. The Commission did, nevertheless, add to the issues to be decided by the examiner whether RKO should be disqualified or assessed a demerit for its trade practices. *Ibid.* at 187.

competitive issue since the evidence being presented in the latter case was far more complete than that in the present proceeding. *See* Joint Appendix at 5. Fidelity opposed the move, and the Commission's ultimate resolution of the problem was to go ahead with a conditional decision in this KHJ case and to make Fidelity a party in the WNAC proceeding. RKO General, Inc., 31 F.C.C.2d 70 (1971).[9]

The Commission heard oral argument in the KHJ proceeding on October 12, 1971, but as of March 22, 1973, had not yet reached its decision. On that day, Fidelity filed with this court a petition for a writ of mandamus. Fidelity Television, Inc. v. Federal Communications Commission, No. 73–1313 (D.C.Cir., filed Mar. 22, 1973). On June 11, 1973, the court, while refusing to issue the writ, stated that the Commission's decision had been unreasonably delayed and ordered it to report its progress within 30 days. *Ibid.* The Commission, although it did report on July 6, 1973, had still not issued a decision when, on November 21, 1973, Fidelity renewed its petition here.

*Ibid.* On December 6, 1973, before the court could act, the Commission announced its decision. Joint Appendix at 1.[10]

By a divided vote, the agency reversed the hearing examiner and granted RKO's renewal application.[11] The only expression of majority views was in the opinion joined by Commissioners Robert E. Lee and Reid. The opinion found that KHJ had neither engaged in nor benefited from coercive reciprocity, but had engaged only in mutual patronage reciprocity. However, the Commission concluded, partially on the basis of the widespread nature of the practice, that the injunction entered in the Ohio antitrust suit was sufficient to stop the practice and that RKO should not be denied a license for doing something arguably legal when done. Joint Appendix at 10–11. The opinion also determined that KHJ's past performance in terms of programming and community relations while not "unusually good" or "superior" was not "insubstantial" or "unusually poor."[12] Furthermore, RKO had promised in its 1962 renewal application no

**9.** Fidelity participated in the WNAC hearing through counsel who also represented one of the WNAC challengers. RKO General, Inc. (WNAC–TV), FCC 74D–36 at 1 (released June 21, 1974). The Review Board also added to the WNAC proceeding an issue relating to RKO's candor in its testimony in the KHJ proceeding. RKO General, Inc., 30 F.C.C.2d 138, 144 (1971).

The Department of Justice, meanwhile, filed a brief with the Commission urging disqualification of RKO if the Commission agreed with the facts found by the hearing examiner. Joint Appendix at 320, 348.

— - -

**10.** After the Commission's decision, Fidelity moved this court to dismiss its petition for a writ of mandamus as moot. The Commission did not oppose the move, and on December 21 this court entered an order dismissing the petition. Fidelity Television, Inc. v. F.C.C., 163 U.S.App.D.C. 441, 502 F.2d 443, 447 (1974). Fidelity then filed a petition for review of the December 6 order. On February 22, 1974, two months after it had tacitly conceded the finality of the December 6 order by not opposing Fidelity's motion to dismiss the petition for a writ of mandamus, the Commission asked this court to dismiss Fidelity's appeal for lack of

jurisdiction, contending that the December 6 order was not a "final order" within the terms of 47 U.S.C. § 402(b)(1) (1970). We rejected that contention in an order issued July 3, 1974 and an opinion of August 2, 1974. *Ibid.*

**11.** There was no opinion subscribed to *in toto* by a majority of the participating members. Commissioners Robert E. Lee and Reid joined in an opinion (Commissioner Reid without hearing oral argument); then Chairman Burch concurred in the result without further statement; Commissioners Johnson and H. Rex Lee dissented in opinions; and Commissioners Wiley and Hooks did not participate. Joint Appendix at 1.

**12.** *See* Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 398 (1965):

A past record within the bounds of average performance will be disregarded since average future performance is expected.

. . .

We are interested in records which, because either unusually good or unusually poor, give some indication of unusual performance in the future.

more than it had provided. Therefore, the opinion stated, since the "record must be deemed to be within the bounds of average performance expected of all licensees, [it] warrant[s] neither a preference nor a demerit." Joint Appendix at 16.

Going on to diversification, the opinion found that while RKO superficially looked poor in this category (in that the company was the licensee of AM and FM stations in Los Angeles as well as stations in other states and was a shareholder in several cable television systems), each station was operated independently and, particularly in the case of KHJ, was one of many media outlets in its market. Finding that the dangers of non-diversification, which it characterized as promotion of "any national or other uniform expression of political, economic, or social opinion," did not exist in this case, the opinion concluded that "we are not persuaded that the nature of RKO's interests is such as to have any adverse effect on the flow of information for the audience to be served here." Joint Appendix at 17. The opinion also found that, since a Fidelity stockholder owned an interest in several suburban Los Angeles newspapers, the challenger was not entirely free of diversification problems. Finally, noting ongoing rulemaking proceedings on the application of the diversification criterion to renewal

applicants, including a proposed rule requiring divestiture, the opinion concluded that "neither applicant has made a sufficient showing to warrant the award of any preference under the diversification criterion." Ibid.

On the subject of integration, for which the hearing examiner had given Fidelity a demerit, the opinion found the two applicants equal. It said that Fidelity's conduct as an applicant had indicated that "the record here gives little promise that Fidelity will effectively implement its paper integration promises." Joint Appendix at 20. On the other hand, RKO was found to have achieved the purposes of integration—local control and accountability—through its policy of station independence, and by requiring active participation in community affairs by station employees. Ibid.

Finding the two applicants thus equal on the standard comparative factors, the opinion based the ultimate outcome on a policy decision that "credit must be given in a comparative renewal proceeding, when the applicants are otherwise equal, for the value to the public in the continuation of the existing service." Ibid. at 22. This was found to have tipped the balance in RKO's favor, and the license was therefore renewed—conditional with respect to anticompetitive practices on the final outcome of the WNAC proceeding.[13]

13. We do not now have before us the Commission's decision in the WNAC case, which has not yet issued. That decision and the agency's interpretation of it in deciding whether to revoke RKO's license for KHJ will of course constitute an appealable order of the Commission, which may then be appealed by either Fidelity or RKO. The fact that the ultimate decision of the Commission will be an appealable final order does not, as we stated in our earlier decision, detract from our jurisdiction in the present case. 163 U.S.App.D.C. 450, 502 F.2d at 452.

Commissioner Johnson dissented from the decision, calling it "the worst decision of this Commission during my term of seven years and five months." Joint Appendix at 29. He objected to the decision on four grounds: (1) that RKO's anticompetitive conduct should disqualify it as a licensee; (2) that RKO's broadcast record was less than mediocre and

the fact that it had promised no more was irrelevant; (3) that Fidelity was clearly superior in integration, local ownership, and diversity, characteristics which the Commission had often held absolutely to be plus factors, and (4) that Fidelity should have been able to adduce evidence on its proposed programming. Ibid. at 30–33.

Commissioner H. Rex Lee also dissented, largely because he thought that RKO's anticompetitive conduct should totally disqualify the company. Commissioner Lee, while not disagreeing with Commissioner Johnson's assessment of Fidelity's virtues on the traditional criteria, stated that if the Commission chose to disregard these criteria in a renewal proceeding, it should at least follow a recent precedent and decide the case on past performance which Commissioner Lee found "insubstantial." Joint Appendix at 34–42; see A. H. Belo Corp., 40 F.C.C.2d 1131 (1973).

## II

Before considering the validity of the Commission's ultimate decision under the applicable standards, it is necessary to consider some procedural and preliminary points pressed upon us by appellant.

■ First, Fidelity has argued (Brief for Appellant at 37–42) that this court should overturn the Commission's decision or at least disqualify then Chairman Burch ·on the grounds that "the decision in this case is nothing more than an extension of the Commission's operational bias in favor of incumbent licensees." Brief for Appellant at 42. This bias has, appellant claims, been revealed in prior decisions of the Commission and in Chairman Burch's testimony before Congress. The claim is almost exactly the same as that made and rejected in F. T. C. v. Cement Institute, 333 U.S. 683, 700–02, 68 S.Ct. 793, 92 L.Ed. 1010 (1948), and we find that case controlling.

Next, Fidelity charges that the Commission's ultimate decision was fatally defective because· it was based on a record limited by the Commission's earlier, allegedly improper, decisions to restrict the hearing to the "standard comparative issue." At various points in the proceeding, Fidelity unsuccessfully sought the addition of five issues—distribution of services (the so-called 307(b) issue), service philosophy, programming, needs ascertainment, and anticompetitive conduct. We consider each of these rulings of the Commission in turn.

■ Section 307(b) of the Communications Act, 47 U.S.C. § 307(b) (1970), requires the F.C.C. "to provide a fair, efficient, and equitable distribution" of television service to the communities of the United States. Fidelity contends that "the Southland," which it describes as Orange County and the communities to the south and east of Los Angeles, Joint Appendix at 198, is a community without television service but which deserves it under section 307(b). This is not technically a comparative issue, since if Fidelity were right then appellant, meeting the minimum requirements, could receive the license regardless of the merits of RKO's operation of KHJ. *See* Anthony, *supra* note 3 at 85–87. However, a "307(b) issue" is, when properly raised, added to the comparative hearing order and considered as part of the comparative hearing. *See, e. g.*, Southern Tier Radio Service, Inc., 19 F.C.C. 496 (1954); St. Louis Telecast, Inc., 22 F.C.C. 625 (1957).

■ The Commission denied Fidelity's request for addition of a 307(b) issue because Fidelity had failed to make the necessary first showing that "the Southland" was a community, let alone a separate community in need of television service. Joint Appendix at 160. The Commission's decision cannot be overturned. In failing to define the Southland with greater specificity, Fidelity rendered its request facially insufficient under the standards previously announced. In *Southern Tier Radio Service, Inc., supra*, § 307(b) was held not to be relevant because the applicant was unable to define with precision "Greater Endicott." 19 F.C.C. at 551. When Fidelity failed even to list the political units· which make up "the Southland," the Commission was justified in rejecting the request as facially insufficient. *Cf.* United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956). The Commission also found that Fidelity had not presented a prima facie showing that Norwalk, the one clearly identified community, was "significantly independent of Los Angeles from the economic and cultural standpoint," noting that Fidelity had based its proposed advertising revenues on the entire Los Angeles market. Joint Appendix at 159–60. There is no sound basis for questioning this factual determination; this court has previously affirmed a finding that a suburb only slightly closer to Los Angeles than Norwalk was not a separate community. Huntington Broadcast Co. v. F. C. C., 89 U.S.App.D.C. 222, 192 F.2d 33 (1951), aff'g Huntington Broadcast Co., 14 F.C.C. 563 (1950). *See also* St. Louis

Telecast, Inc., 22 F.C.C. 625, 712–14 (1957).

■ As part of the same petition, Fidelity asked the Commission to add a "service philosophy" issue. That concept, as we have noted, is a term of art used to describe an applicant's intention to direct its programming only or primarily to a part of the area to be covered by a station's signal. The Commission found that Fidelity fits directly into the mold developed in Petersburg Television Corp., 19 F.C.C. 451 (1954)—that appellant had surveyed only three Los Angeles residents and could therefore be found to have ignored the actual city of license in its planning. 19 F.C.C. at 464–65, 475; see Joint Appendix at 160. The Commission's decision is factually accurate, see Joint Appendix at 199, and based on the Petersburg standard Fidelity could legitimately have been given a demerit for "service philosophy." The decision not to add the issue to the comparative hearing was not only harmless but probably favorable to Fidelity.[14]

■ Another additional issue rejected by the F.C.C. was programming. Prior to the 1965 Policy Statement, 1 F.C.C.2d 393 (1965), the proposed programming of the competitors was compared and the ruling on this criterion formed an important part of the ultimate determination of who received the license. See Jaffe, WHDH: The FCC and Broadcasting License Renewals, 82 Harv.L.Rev. 1693, 1695 (1969). In the agency's view, this resulted in paper battles with little assurance that the winner would actually produce the programming forecast; the issue was deemed especially unfair when a renewal applicant, who had to run on his record, was pitted against a challenger who could promise any type of programming the Commission favored. Ibid. The 1965 Policy Statement put an end to this practice by requiring that a

programming issue be separately designated and by stating that it would be allowed only "to the extent [programming differences] go beyond ordinary differences in judgment and show a superior devotion to public service." 1 F.C.C.2d at 397. The Commission also made clear that percentage differences, even with regard to the highly favored category of local programming, must be based on ascertained community needs in order to justify the addition of a programming issue. Ibid.

Fidelity requested that the Commission add a programming issue because of its emphasis on local programming and the "marked differences in the percentages which the applicants propose to devote to the various program categories." Joint Appendix at 205. The Commission refused on two grounds—that the program differences were mere differences in judgment and that Fidelity had not done an adequate needs survey to justify the insertion of the issue on the basis of "superior devotion to public service." Ibid. at 161. If the agency's decision had been based only on the first ground, it might well be questionable. Fidelity offered 22% less entertainment and twice as much educational and news programming as RKO. Ibid. at 205–06. These differences exceed those on which an issue was allowed in WPIX, Inc., 23 F.C.C.2d 245, 256, 259 (1970), and on which the Review Board was requested to reconsider in Chapman Radio & Television Co., 7 F.C.C.2d 213 (1967).[15] However, the Commission also found that the needs-ascertainment survey Fidelity made, which was basically limited to the "Southland," did not provide an adequate basis on which to decide whether the appellant's programming differences were really related to the needs of the entire service area (which of course included Los Angeles). Fidelity understood the Commission's position that a

---

14. The hearing examiner's decision indicates that he would have found against Fidelity on a "service philosophy" issue. Joint Appendix at 149.

15. See F.C.C. Forms 301, Statement of Program Service, Proposed Operation, in Birmingham Broadcasting Co., Dkt # 16761; Alabama Television, Inc., Dkt # 16760; Birmingham Television Corp., Dkt # 16758; Chapman Radio & Television Co., Dkt # 15461.

programming issue depended on three factors—differences in programming, adequate needs ascertainment of the area covered by the license, and relation of the needs to the proposed programs. Joint Appendix at 206. In choosing to orient its surveys only to one part of the service area, Fidelity took the risk that if it did not win on the 307(b) issue, *supra*—as it did not—the Commission could find that it had inadequately surveyed the needs of its area. Knowing this, Fidelity cannot now complain that it lost its bet.[16]

■ Fidelity's attempt to have a separate needs-ascertainment issue added requires little discussion. Commission rules provide (and have so provided since 1963) that a motion for enlargement of issues must be filed within 15 days after the notice of issues scheduled for the hearing is published in the Federal Register. 47 C.F.R. § 1.229(b) (1973). The Federal Register notice in this case was published on June 11, 1966, 31 Fed.Reg. 8253 (1966), so that the time to file a petition to enlarge ran out on Monday, June 27, 1966. The Review Board found that Fidelity had not shown that the petition filed July 24, 1967 could not have been filed in time, Joint Appendix at 178, and Fidelity did not appeal the Board's ruling to the Commission. Fidelity having failed to exhaust its administrative remedies on this issue, the Review Board's determination is not properly before this court. *Cf.* Pine v. United States, 371 F.2d 466, 467–68, 178 Ct.Cl. 146 (1967).

Finally, we take up Fidelity's request to have an issue relating to RKO's anticompetitive conduct added to the hearing. While the Commission eventually did add such an issue, Joint Appendix at 187, it acted rather late and on a limited basis, and Fidelity argues that therefore it was not able to produce an adequate record on the subject. Appellant's Brief at 19. The background has already been touched on in Part I, *supra*. Borrowing from the Justice Department's suit against General Tire, Fidelity charged that RKO, through its parent General Tire, had engaged in "reciprocity," the practice of obtaining sales by conditioning purchases on future orders. The challenge was in essence that KHJ, because of its place in the General Tire structure, automatically received advertising without competing with other Los Angeles stations. If proven, the anticompetitive effect on other stations would be obvious. Reciprocity is especially complex in a conglomerate like General Tire because its needs and products are diverse; for example, rubber purchases can be conditioned on advertising sales. Fidelity argues that, for this reason, it was necessary for it to be able to present evidence on reciprocity in the entire General Tire organization, and not simply that which was "patently germane to RKO's stewardship of KHJ–TV," as required by the hearing examiner. Appellant's Brief at 17–20; *see* Joint Appendix at 182.

■ Given the nature of the charges, including the allegation of direct involvement by RKO and not merely General Tire, *see* Complaint at 7, United States v. General Tire & Rubber Co., *supra*, it seems that the Commission could well have granted Fidelity's initial request to enlarge the issues to include anticompetitive conduct. But the error proved harmless. By the time this case reached this court, Fidelity had managed to create a fairly substantial record in this proceeding on the reciprocity practices of RKO, not merely in its operation of

---

16. Fidelity also maintains that it was error for the Commission to remand *Chapman* to the Review Board to allow Alabama Television, Inc., one of the competitors in that case, to show that its programming differences were related to the needs ascertained. *See* 169 U.S. App.D.C. pp. —— ——, 515 F.2d pp. 689–690, *supra*. The difference between *Chapman* and this case is that Alabama Television had done an adequate survey but had not shown how the ascertained needs matched the proposed programming. Here, the Commission found that Fidelity was missing one of the primary requirements, a proper survey, and therefore that no explanation by Fidelity could show how its programming met unknown needs.

KHJ, but throughout the entire broadcast side of its business. Furthermore, Fidelity also participated in the more intensive hearing on General Tire's anticompetitive conduct as part of the WNAC renewal proceeding. *See* Part I, *supra.* The renewal of RKO's license for KHJ was expressly made subject to the ultimate determination in the WNAC case. A full record on the anticompetitive issue has thus been compiled, and it will be available for consideration with respect to KHJ after the Commission makes its final decision on the status of RKO's license based on the outcome of the WNAC proceeding.

### III

 It will be helpful to consider separately one other matter before coming directly to the agency's decision on the actual comparison of Fidelity and RKO. Before a comparative hearing can be held, or at least before the winner can receive a license, it is necessary for the Commission to determine that the applicant meets "the citizenship, character, and financial, technical, and other qualifications" the F.C.C. prescribes. *See* 47 U.S.C. § 308(b) (1970); Anthony, *supra* note 3 at 34. In this case, there was serious objection on the character issue only as it related to RKO's alleged

anticompetitive conduct.[17] The basic nature of the charge and the procedural problems have been discussed in Part II, *supra.* Here we assess the validity of the Commission's determination, on the basis of the record in this proceeding,[18] *not to disqualify or grant a demerit to RKO because of the trade relations practices of General Tire.*[19]

 The antitrust law on reciprocity is not entirely settled. The practice of explicitly and successfully conditioning orders for supplies on the supplier's purchase of products from the buyer has been held to be a violation of at least Section 5 of the Federal Trade Commission Act since the 1930's.[20] Also, the opportunity for such practices which might arise from a merger can result in the merger's constituting a Clayton Act section 7 violation.[21] When no merger is involved, and in particular where it is not clear that attempts to induce sales through purchases are successful, the controlling rule is less plain.[22]

 The evidence in this case largely shows, as the agency opinion found, ineffective attempts at reciprocity, particularly with respect to KHJ.[23] Joint Appendix at 10–11. At best, there is doubt whether unilateral, unsuccessful attempts at reciprocity constitute an antitrust violation. *See* Kintner, The Anato-

---

**17.** RKO and the Broadcast Bureau also filed petitions questioning Fidelity's character, but the Commission refused to conduct hearings on those allegations. Joint Appendix at 188–94.

**18.** The bearing of the WNAC record on this issue is left for future determination (if the problem should be raised).

**19.** Character is both a non-comparative and a comparative consideration. While the Commission can disqualify a party entirely on the basis of poor character, it has also retained the option to use lesser character blemishes as demerits in a comparative proceeding. Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 399 (1965).

**20.** 15 U.S.C. § 45 (1970) (Section 5 of the Federal Trade Commission Act, 38 Stat. 719 (1914)); *see* Waugh Equipment Co., 15 F.T.C. 232 (1931); California Packing Corp., 25 F.T.C. 379 (1937).

**21.** 15 U.S.C. § 18 (1970) (Section 7 of the Clayton Act, 38 Stat. 731 (1914)); *see* F. T. C. v. Consolidated Foods Corp., 380 U.S. 592, 594–95, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965).

**22.** *See generally* United States v. General Dynamics Corp., 258 F.Supp. 36 (S.D.N.Y.1966). *See also* Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

**23.** As indicated above, there was disagreement whether evidence relating to General's reciprocity practices, but not to RKO's or KHJ's involvement in them, should have been admitted. We think it clear that if all General Tire divisions except RKO had been involved in reciprocity, there would be no sufficient basis for a demerit in this broadcast license proceeding. While the entire corporate practice is relevant, this record shows that RKO's role was substantially less than that of General's other divisions.

my of Reciprocity, 56 A.B.A.J. 232, 233 (1970). In the *General Dynamics* case, so far the most expansive on the subject, only successfully completed efforts were considered by the court in determining whether the Sherman Act had been violated, 258 F.Supp. at 66. We do not think that the F.C.C. is required to go further than the courts—particularly with respect to an earlier period in which the law and the general practice were even less clear than today. *See infra.*[24]

There are also instances in the record of successful reciprocity. Most of these have little to do with RKO, and even less with KHJ, whose ratings at times were so poor that, even with the added push of reciprocity, no advertising was received. Joint Appendix at 122–26, 132–35. In addition, as was typical following the coercive reciprocity cases of the 1930s, it appears that the reciprocity shown in this record was considered mutually beneficial by both companies, and that although purchases might in some cases be rerouted in response to reduced sales, General did not attempt to use coercion as an inducement.

 Contemporary sources indicate that this type of noncoercive reciprocity was extremely widespread in the early 1960s, but more recent writings suggest that it has largely been abandoned in

recent years. *See* Handler, Emerging Antitrust Issues: Reciprocity, Diversification and Joint Ventures, 49 Va.L.Rev. 433, 435 (1963); Hausman, Reciprocal Dealing and the Antitrust Laws, 77 Harv.L.Rev. 873, 874 (1964). *Compare* Kintner, The Anatomy of Reciprocity, 56 A.B.A.J. 232, 233 (1970). The practice was not affirmatively declared illegal until the 1966 *General Dynamics* case, 258 F.Supp. at 66, and even there the merger context might have accounted for the ruling.[25] General Tire has been since 1970 under a consent decree which prevents it from engaging in most sorts of reciprocal trade relations. In these circumstances, and remembering that KHJ was only a small part of what went on and that antitrust considerations are only one segment of the Commission's concern with the character of a broadcast applicant, we find that the F.C.C. did not act arbitrarily, capriciously, or illegally in refusing to give RKO a demerit or to disqualify it for the reciprocity practices outlined in this record.[26]

## IV

 We come now to our final task—scrutiny of the F.C.C.'s ultimate decision in the light of the standards for comparative renewal hearings developed by the agency in the past.[27] In reviewing the

---

24. While it is clear that the F.C.C. may take account of anticompetitive actions short of antitrust violations, National Broadcasting Co. v. United States, 319 U.S. 190, 223, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), it is certainly not clear that, in the absence of an actual conviction, it must disqualify or downgrade on such a basis. The presence of a statutory provision which explicitly grants a court the option of requiring revocation of a license on conviction for an antitrust violation suggests that the Commission retains the option to do less when no conviction is involved. See 47 U.S.C. § 313(a) (1970).

25. In addition, a strict reading of *General Dynamics* would be that all discussion of reciprocity as a Sherman Act violation is dictum since the court found that an insubstantial volume of commerce had been affected. 258 F.Supp. at 66–67.

26. As we have stressed, under the Commission's decision the agency's ruling on anticom-

petitive practices is subject to reopening in the light of the WNAC proceedings (which have not yet been finally determined by the Commission).

27. We are not required, for present purposes, to deal with the criticisms leveled in recent years against the comparative hearing process, especially as it involves renewal applicants. *See, e. g.,* Anthony, *supra* note 3; Goldin, "Spare the Golden Goose"—The Aftermath of *WHDH* in FCC License Renewal Policy, 83 Harv.L.Rev. 1014 (1970); Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards, 75 Harv.L.Rev. 1055 (1962); Grunewald, Should the Comparative Hearing Process be Retained in Television Licensing?, 13 Am.U.L.Rev. 164 (1964); ·Comment, The FCC and Broadcasting License Renewals: Perspectives on *WHDH*, 36 U.Chi.L. Rev. 854 (1969).

The 1965 Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393 (1965),

F.C.C.'s decision, particularly under the broad mandate given that agency—that it shall grant a license "if public convenience, interest, or necessity will be served thereby," 47 U.S.C. § 307(a) (1970)—our function is, as has often been repeated, a limited one. It is necessary only that we satisfy ourselves that the agency acted within the bounds of its statutory and constitutional authority,[28] that it has followed its own procedural rules and regulations,[29] that its findings of fact are reasonably articulated and based on substantial evidence in the record as a whole,[30] that its conclusions do not deviate greatly from past pronouncements without sufficient explanation,[31] and that in general it has engaged in reasoned decision-making.[32]

■ The two basic features of the present system as the Commission has developed it are that a renewal applicant will be judged on his past record, and

that the so-called traditional comparative factors are largely predictors of the kind of service a new applicant would offer and not requirements for being a good licensee.[33] It is not our function to approve or disapprove this framework if it falls, as it does, within the agency's authority. As we have said before,[34] and as the F.C.C.'s oversight committees in Congress have recently reiterated,[35] the comparative hearing process might well come much closer to producing licensees who act in the public interest if standards of "substantial service" in programming and other areas were developed either by the FCC directly or through stricter rules for ascertainment of community needs, and if licensees were required to follow them or run the risk of non-renewal.[36] But we reiterate that it is not our judicial job to direct the Commission on how to run the comparative hearing process, beyond assuring that the administrative process respects the

which sets out comparative criteria. for most comparative hearings, by its own terms "does not attempt to deal with the somewhat different problems raised where an applicant is contesting with a licensee seeking renewal of license." *Ibid.* at 393 n.1. While the F.C.C. held soon after the 1965 statement was issued that the statement would govern the introduction of evidence in a renewal comparative proceeding, Seven (7) League Productions, Inc., 1 F.C.C.2d 1597, 1598–99 (1965), it was not until 1970 that the Commission attempted to delineate explicitly the standards which would apply in a comparative renewal proceeding. Policy Statement Concerning Comparative Hearings Involving Regular Renewal Applicants, 22 F.C.C.2d 424 (1970). The 1970 Policy Statement, however, operated to deny challengers a full comparative hearing, and it was vacated by this court as contrary to the Communications Act and the *Ashbacker* doctrine. Citizens Communications Center v. F. C. C., 145 U.S. App.D.C. 32, 447 F.2d 1201, 1214 (1971). The Commission thereupon undertook to develop a new set of standards for renewal applicants, Formulation of Policies Relating to the Broadcast Renewal Applicant, Stemming from the Comparative Hearing Process, 27 F.C.C.2d 580 (1971), but this inquiry has not yet resulted in a new policy statement.

**28.** Johnston Broadcasting Co. v. F. C. C., 85 U.S.App.D.C. 40, 175 F.2d 351, 356 (1949).

**29.** Service v. Dulles, 354 U.S. 363, 388, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

**30.** Colorado Interstate Gas Co. v. F. P. C., 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 487–88, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

**31.** Columbia Broadcasting System, Inc. v. F. C. C., 147 U.S.App.D.C. 175, 454 F.2d 1018, 1026 (1971).

**32.** *See generally* Greater Boston Television Corp. v. F. C. C., 143 U.S.App.D.C. 383, 444 F.2d 841, 850–53 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

**33.** *See* A. H. Belo Corp., 40 F.C.C.2d 1131, 1133 (1973); Moline Television Corp., 31 F.C.C.2d 263, 269, 273–74 (1971).

**34.** Citizens Communications Center v. F. C. C., 145 U.S.App.D.C. 32, 447 F.2d 1201, 1213 n.35 (1971); *see* Citizens Committee to Save WEFM v. F. C. C., 165 U.S.App.D.C. 185, 206–207, 506 F.2d 246, 267–68 (1974).

**35.** Broadcast License Renewal Act, H.Rep.No. 93–961, 93d Cong., 2d Sess. 16–17 (1974); Broadcast License Renewal Act, S.Rep.No.93–1190, 93d Cong., 2d Sess. 10 (1974).

**36.** *See* Policy Statement Concerning Comparative Hearings Involving Regular Renewal Applicants, 22 F.C.C.2d 424, 430 (1970). The hearing examiner in this case expressed the belief that if standards had been available RKO would have met them. Joint Appendix at 152.

rights of the public and of competitors assured under the Communications Act and the *Ashbacker* doctrine, and that it produces rational decisions based on factors generally known in advance.

We consider first the Commission's finding that RKO's performance was "average" and not "poor" as the hearing examiner had found.[37] If the performance was poor, then by the Commission's own standards, RKO would have been almost out of the running.[38] While the examiner's decision is an important part of the record before this court, particularly where he is overturned on an inference from facts accepted by the Commission, "it is the agency's function, not the Examiner's, to make . . . the ultimate decision, and where there is substantial evidence supporting each result it is the agency's choice that governs." Greater Boston Television Corp. v. F. C. C., 143 U.S.App. D.C. 383, 444 F.2d 841, 853 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). The record shows that KHJ's programming during the license period was largely oriented to the showing of feature films, usually interrupted by a substantial number of commercials. Joint Appendix at 72–81. On the other hand, the record also shows that RKO was the first licensee in the country to obtain a substantial film library and to make these movies available to the television audience. *Ibid.* at 51. While some films engendered substantial criticism for excessive violence, many of the movies "claim excellence"

and the large bulk were inoffensive. *Ibid.* at 60. In addition, RKO did present, at a substantial expenditure of money, some other entertainment programs which enriched the Los Angeles television scene. *Ibid.* at 60–61. In the non-entertainment category where RKO had not promised much,[39] the showing was similarly mixed. News coverage, for example, even for the 1962–65 era of 15-minute national news, was not overabundant, but on the other hand the station did present a certain amount of coverage of Los Angeles City Council hearings. *Ibid.* at 64–65. On an absolute basis, it might be difficult for all of us, if we were regulators, to characterize KHJ's past performance as "superior," entitling it to "a plus of major significance," [40] but as judges we are agreed that we cannot, on the record as a whole, say that the Commission's decision that programming performance was "average" is bereft of the support of substantial evidence.

Having decided that RKO's programming performance was only "average," the Commission had to go on to the other traditional criteria, comparing Fidelity's predicted success in achieving the goals of integration, local ownership, and diversification with RKO's actual performance in those areas.

As we noted above, the examiner, but not the Commission, gave Fidelity a demerit for its integration proposal. The agency's reversal of the hearing examiner on this point was more apparent than real, since both felt that the propos-

---

**37.** It was not until its 1970 Policy Statement that the Commission made it clear that only a licensee's performance during the license period, and not any effort made to upgrade the station after a challenge was filed, would be taken into account on renewal. 22 F.C.C.2d at 427. This overruled the practice of considering post-term changes in a later comparative hearing. *See* Hearst Radio, Inc., 15 F.C.C. 1149 (1951).

It is, however, inappropriate to compare KHJ's pre–1967 performance with 1971 standards, as one of the dissenters did in this case. Joint Appendix at 38. In fact, KHJ's recent performance in non-entertainment programming can be said to have placed it among the

top stations in the country in terms of the percentage of the broadcast day spent on news, public affairs, and local programming. F.C.C. News Release No. 31512, Oct. 8, 1974 at 118, 220.

**38.** 22 F.C.C.2d at 428 n.4.

**39.** There is no issue of promise versus performance in this case as there was in Moline Television Corp., 31 F.C.C.2d 263 (1971). As the hearing examiner found, RKO's performance matched its promises almost exactly. Joint Appendix at 58–59.

**40.** Citizens Communications Center v. F. C. C., 145 U.S.App.D.C. 32, 447 F.2d 1201, 1213 (1971).

al, while on paper all that the Commission could have wanted, had extremely little chance of being implemented. Joint Appendix at 150–51, 18–20. The examiner's decision was presumably based on his observation of Fidelity's witnesses and on his opportunity to discern the character of Fidelity's owners and their ability to perform. This is precisely the type of examiner's decision which must be given the most weight by the agency, and the Commission's ultimate decision on this point, which in effect agreed with that of the hearing examiner, can stand on the record the hearing examiner created. *See* Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■■■ On RKO's behalf, the Commission found that, through the company's policy which "requires the management of its stations to involve themselves in a wide range of community and civic organizations and to use the information gained from such contacts to help determine the direction and programming of the station," RKO's management had acquired the kind of interest in local affairs which made the station responsive to the community—the ultimate goal of the integration and local ownership criteria. Joint Appendix at 20. The examiner's decision shows that KHJ's supervising personnel were long-time residents, including natives, of the Los Angeles area, and were active in a wide variety of civic associations both locally and nationally. Joint Appendix at 55–56. The

record also shows more formal efforts to ascertain community needs, as well as the results of these efforts in KHJ's programming. *Ibid.* at 57–58.[41] While we cannot say that RKO's local interest performance was any better than Fidelity's could be predicted to be on the basis of the challenger's integration proposal, we also cannot properly overrule the Commission's finding that it was no worse. *Ibid.* at 20–21.

■■■ With respect to diversification, it was apparent on this record that Fidelity had far fewer media interests than did RKO[42] and that if diversification in its quantitative form were the basis of comparison, Fidelity should have been preferred on this point. Joint Appendix at 149. However, in a renewal hearing, or in a standard comparative hearing where one applicant is the licensee of other stations, the Commission has on occasion considered whether the licensee has in the past met the goals of diversification by operating his stations autonomously and independently. *See* McClatchy Broadcasting Co., 19 F.C.C. 343, 380–81 (1954). *But cf.* Chronicle Broadcasting Co., 18 F.C.C.2d 120, 123 n.9 (1969). In addition, the number of other outlets for diverse views in the market is an important consideration in weighing the need for a new organization to receive the license. *See* Greater Boston Television Corp. v. F. C. C., 143 U.S.App.D.C. 383, 444 F.2d 841, 859–60 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971); City of Camden, 18 F.C.C.2d 412, 422 n.22 (1969). Here, both the

---

**41.** While the hearing examiner found that "the most solid preference that Fidelity enjoys stems from the fact that its proposal is backed by a comprehensive sampling of public opinion," that sample was oriented almost entirely to "the Southland," and was found by the examiner "to further contribute to the city of Los Angeles' becoming the hole in the doughnut of its surrounding communities." Joint Appendix at 149. Furthermore, the affidavits provided by Fidelity to support its claim that its programming was community-induced were of the "here's our schedule—don't you like it" variety which the Commission now considers unacceptable. Joint Appendix at 208–12; *see* Ascertainment of Community Needs by Broad-

cast Applicants, 13 P & F Radio Reg. 2d 1903, 1904 (1968).

**42.** The agency's opinion used the ownership by one of Fidelity's minor stockholders of a substantial interest in suburban Los Angeles newspapers to diminish Fidelity's rating on diversification. Joint Appendix at 17. Fidelity contends, however, that the newspapers were mere advertising throwaways which cannot be considered media interests. Appellant's Reply Brief at 37. This is one of the charges on which no hearing was held; it should not have been used at all by the Commission. The error, however, was minor and, in our view, did not control or significantly affect the outcome.

Commission and the examiner found that KHJ was operated independently of control from the national office of RKO or General Tire, except in broad policy areas. Joint Appendix at 17, 57. While the examiner's report shows some headquarters supervision, particularly in making sure that local stations live up to their promises to the F.C.C., *ibid.* at 52–53, there is nowhere near enough evidence in the record for us to require the Commission to come to any other conclusion on station autonomy. There is also substantial evidence to support the Commission's findings that there is sufficient opportunity to present diverse views through the area's 126 radio stations, 12 commercial television stations [43] and 350 newspapers, including two general circulation dailies. Though the Commission has vacillated over the years in its general approach to diversification, its determination in this case was not in direct conflict with any rule or any policy as enunciated in prior decisions, and we cannot say that the approach here was an unreasonable or unlawful application of the existing diversification principles to this renewal case.

▮ On the whole it is fair to say that the Commission found that the ultimate effect of its analysis of the record was that Fidelity and RKO were essentially equally poor contenders—or, at the best, both were minimally acceptable applicants. While the agency was under no obligation to give the license to either competitor, we cannot say that it committed legal error when, in its attitude as of the times pertinent in this case, it took the view that "minimal service is to be preferred to no service at all." *Compare* Broadcast License Renewal Act, H.Rep.No.93–961, 93d Cong., 2d Sess. 17 (1974). There is no need here to expand on "renewal expectancies." We are not faced with a situation where a superior applicant is denied a license because to give it to him would work a "forfeiture" of his opponent's investment. We merely confirm what we intimated in the *Greater Boston Television Corporation* case—that, when faced with a fairly and evenly balanced record, the Commission may, on the basis of the renewal applicant's past performance, award him the license. 444 F.2d at 854, 859.

It is worth emphasizing the special posture of this particular case. It is based on a record built under standards which have since been upgraded or modified or reconsidered by the Commission. New community ascertainment criteria have been issued and there is now a requirement for something of a continuing dialog between a station and its audience. The agency has also undertaken its rule-making process on cross-ownership. The development, through rule-making, of standards of "substantial performance" also seems imminent and should prove helpful. We hold here only that under the former criteria the Commission, when faced with a poor challenger who offers little more and is likely in fact to provide somewhat less than the incumbent, did not commit reversible error by awarding the license to the incumbent.[44]

Affirmed.[45]

---

**43.** The Commission's decision states that there are 15 commercial television stations assigned to the Los Angeles Market. Joint Appendix at 16. However, only 12 commercial stations are currently operating. 44 Television Factbook, at 70–b.

**44.** Judges Leventhal and Davis join in the court's affirmance of the Commission for the reasons given, but wish to note, speaking for themselves, that the Commission could have considered the alternatives of granting RKO a short or conditional license rather than limiting itself to a choice of nonrenewal or a full three-year license. The FCC's authority to grant short licenses was made explicit by the 1960 Communications Act Amendments, now codified at 47 U.S.C. § 307(d) (1970), and the agency has in fact granted short licenses particularly where ex parte communications or other conduct have raised questions about a potential licensee's character or where the successful licensee has succeeded only by default. *See* Greater Boston Television Corp. v. F. C. C., 143 U.S.App.D.C. 383, 444 F.2d 841, 845 (1970), cert. denied, 403 U.S. 923, 91 S.Ct.

ON PETITIONS FOR REHEARING, RECONSIDERATION OR CLARIFICATION AND SUGGESTIONS FOR REHEARING EN BANC

Before LEVENTHAL and ROBB, Circuit Judges, and DAVIS *, Judge, United States Court of Claims.

PER CURIAM:

Fidelity Television, Inc. has filed a petition for reconsideration of our March 6, 1975 decision in this case. Also, the Citizens Communications Center (CCC), a nonprofit organization supporting diversity in broadcasting, has asked for leave to file as amicus curiae a petition in support of rehearing or clarification of our decision, and has submitted such a petition. We regret that CCC did not ask to participate in this case at an earlier time. As intervenor RKO has noted in its opposition to CCC's petition, the Center's concern is really with what the Commission, rather than the court said and did, and the arguments it now makes could have been cogently made earlier. We have, however, decided to allow the Center's petition to be filed, to give us the opportunity to reemphasize the limited scope of the previous opinion.

Having done so, we deny the petitions for rehearing and reconsideration.

Our opinion affirmed the Federal Communication Commission's decision to renew the license of intervenor RKO General, Inc. for station KHJ–TV in Los Angeles rather than awarding the license to challenger Fidelity Television, Inc. The decision in no way approves a return to the partial comparative hearing procedure of the 1970 Policy Statement Concerning Comparative Hearings Involving Regular Renewal Applicants, 22 F.C.C.2d 424 (1970), which procedure we vacated in Citizens Communications Center v. F. C. C., 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971). The Commission here held, as it must, a full comparative hearing under the 1965 Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393 (1965). The "spur to competition" of that procedure was preserved here, and in fact reaffirmed when the Commission required KHJ, upon a finding that its service had not been superior, to run the gamut of comparison with Fidelity on the traditional comparative factors of integration and diversification.

What we decided 169 U.S. App.D.C. pages —— ——, 515 F.2d

2229, 29 L.Ed.2d 701 (1971); South Florida Television Corp. v. F. C. C., 121 U.S.App.D.C. 293, 349 F.2d 971, 972 (1965), cert. denied, 382 U.S. 987, 86 S.Ct. 541, 15 L.Ed.2d 475 (1966). The Commission also has the authority to grant conditional licenses, 47 U.S.C. § 303(r) (1970), and has in the past even granted a one-year conditional license, see Office of Communication of the United States Church of Christ v. F. C. C., 123 U.S.App.D.C. 328, 359 F.2d 994 (1966). While in that case this court disapproved the grant of any license to WLBT the court did state that, where the licensee showed signs of being willing to live up to the conditions, such a limitation on the license was completely proper. Id. at 1008 n.28.

Particularly where a qualified competitor brings a licensee's weaknesses to the FCC's attention, the public interest might be better served by the Commission's considering whether a short or conditional license would induce the licensee to correct the weaknesses—here going both to programming and to character. See Golden, supra note 26 at 1026–27. In addition, such a license could serve, if

needed, as a basis for treating the licensee as a new applicant when the license comes up for renewal. See Greater Boston Television Corp. v. F. C. C., supra 444 F.2d at 854, 856.

Since this point, though suggested from the bench at oral argument, was not raised before the Commission, nor presented to this court in the appeal papers, it is not fairly before us for decision at this time. We note the point, however, to avoid the possibility that our affirmance will be taken as precluding such a more limited disposition when the FCC comes to consider the impact of the WNAC proceeding.

45. Our affirmance, as already observed (see notes 9, 12, 17, and 25, the text appurtenant thereto, and the text at the end of Part III, supra), is conditional (as was the Commission's decision) on the ultimate outcome of the WNAC proceedings. See Fidelity Television, Inc. v. F. C. C., 163 U.S.App.D.C. 441, 449–50, 502 F.2d 443, 451–52 (1974).

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1970).

page 702) is that the Commission could permissibly determine after such a full comparative hearing that (a) "Fidelity and RKO were essentially equally poor contenders—or, at the best, both were minimally acceptable applicants", (b) though in this situation the agency might well have rejected both the existing licensee and the challenger, that position was not put before the Commission and in those circumstances we cannot overturn its decision to follow the theory that "minimal service is to be preferred to no service at all"; (c) since a choice was to be made, between two competitors on an equal plane, it could properly light on the existing licensee; and (d) the issue of whether the license could or should have been renewed conditionally or for a period shorter-than-normal was not before us, not having been raised below or here.

As we pointed out in the opinion (169 U.S.App.D.C. pages ——, ——, 515 F.2d pages 702, 703), Fidelity did not show itself a superior or preferable applicant but rather "a poor challenger who offers little more and is likely in fact to provide somewhat less than the incumbent." On this general subject the hearing examiner said: "Once it clears the easy (for it) hurdles—local ownership, radio diversification and public opinion—Fidelity does not look too good. Attached to its qualifications are no experience in the field of broadcasting, no contributions to the art, no proof through the school of experience of licensee answerability for stewardship, no proof, through the same school, of ability to stand the shock of adverse financial conditions, and no demonstrated ability to conceive and present programs of high quality [footnote omitted]." In the same connection, the examiner severely criticized the applicant's integration proposals, which placed inexperienced stockholders, working part-time, in supervisory roles. He said: "If Fidelity is serious about its proposal, it is projecting an operation that will, at best, be signalized by confusion, and, at worst by chaos. * * * Proposals such as this are susceptible of two interpreta-

tions that should not be shrugged off. Either the proponents honestly believe that operation of a television station, unlike any other enterprise, can be effectively directed by an inexperienced group on a part-time basis, or they advance the proposal for show purposes only without intention to effectuate it. Neither inference is very palatable. The former suggests witlessness. The latter raises questions as to the advisability of entrusting stewardship to those who would attempt to fob off on a licensing agency such a tall tale." That is the type of challenger this case concerns.

Moreover, we stated several times in the opinion that our review of the Commission looked to the manner in which, in *1973*, not 1975 or any date in the future, the agency applied its then existing policy and rules to the case at hand. At that time, the Commission, by rule and by decision, consistently distinguished, in making assessments under the diversification criterion, between situations in which a multiple licensee wished to obtain a new station and those in which the organization was applying for renewal of a preexisting license. On the other hand, the Commission's decision in this case was rendered prior to promulgation of the 1975 newspaper cross-ownership rules, Second Report and Order, Docket No. 18110, F.C.C. 75–104 ¶ 131 (Jan. 31, 1975). These rules adopt a structural rather than a functional approach to diversification even as to existing licenses under which an entity which owns a newspaper may not, in some structurally specified cases, retain a broadcast license. We made and make no decision whether, under such an approach, it would be possible to allow any entity to retain multiple licenses. We decided only that, *as of 1973*, the FCC applied its contemporaneous diversification policy which, as to renewal applicants, encompassed consideration of functional separation of activities, in a manner which was essentially consistent with prior law.

When the smoke clears away, we are left with the distinct impression that

we have a "nothing" applicant, who has offered a novel construct of a Southland service philosophy; who has an integration philosophy that the examiner correctly derided as being either "witless" or insincere; who has shown lack of candor in certain aspects [1]—and who comes before the FCC rather naked, saying that even so I am better naked than the incumbent, because he lacks diversification. And what we answer is that, on the criteria at the time, the FCC was not in violation of law in applying a diversification criterion that held that RKO's operation of stations autonomously and independently met the objectives sufficiently to withstand the competition of a "nothing" competitor.[2]

The petitions for rehearing and reconsideration are denied.

Statement of BAZELON, Chief Judge, as to why he voted to grant rehearing en banc:

In an earlier day, this court tended to affirm comparative licensing decisions with only the most limited inquiry into the process of decision-making. If the FCC denominated the factors operative in its decisions with some reasonable clarity, this court would not intervene even if the decision under review was illogical in terms of Commission policy, conflicted with past decisions of the agency or otherwise was not fairly reasoned out from established standards. In recent years this court has, it appeared to me, moved away from this posture into a more demanding stance,

requiring of the Commission that it adhere to the rule of law in its comparative and other discretionary decisions.[1] The decision here adopts the form of this more recent approach—assuming a basically in depth inquiry into the Commission's process of decision—but, I think, not the substance. In our earlier approach, we took the view that the comparative decision was essentially political and not bound by the rule of law; the least that could be said for this approach was that it did not attempt to justify in rational terms the helter-skelter so often present in comparative decisions. The court's opinion in this case unfortunately may be seen as a rational justification for an essentially un-rational decision. Moreover, the central issue of the applicability of the rule of law to highly discretionary decisions is not sufficiently delineated and our choices in regard to this issue are therefore less informed to that extent.

The purpose of this statement is to discuss these matters in the course of demonstrating the manner in which the Commission has failed to follow the rule of law in this case. This project involves a consideration of the administrative policies and judicial decisions which the Commission either ignored or misapplied in its decision. The organization of the statement is as follows. First I indicate the manner in which the Commission has granted an illegal renewal expectancy to RKO General, Inc., one of the comparative participants, in contravention of our decision in Citizens Communication Cen-

---

1. In para. 33, the Commission stated that there was a "repeated failure to make timely and necessary reports of new developments affecting a proposal." It noted that "this practice continued even after its attention was directed to the need to keep its house in order." It concluded "we believe that the record here gives little promise that Fidelity will effectively implement its paper integration promises . . . ." (JA 19–20).

2. Even as of 1973, this was not a ruling that excluded all newcomers. Even a newcomer to TV can make a presentation built on the experience of at least one or two key stockholders identified with management, on a reasonably bona fide and practicable approach, the kind

presented by at least one applicant in the much-discussed *WHDH* case, see Greater Boston TV Corp. v. FCC, *infra*, 143 U.S.App.D.C. at 405, 444 F.2d at 863.

1. *See* Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 850–52 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); WAIT Radio, Inc. v. FCC, 135 U.S.App.D.C. 317, 418 F.2d 1153 (1969), on subsequent appeal, 148 U.S.App. D.C. 179, 459 F.2d 1203 (1972); Star Television, Inc. v. FCC, 135 U.S.App.D.C. 71, 416 F.2d 1086, 1089, cert. denied, 396 U.S. 888, 90 S.Ct. 171, 24 L.Ed.2d 163 (1969) (Leventhal, J., dissenting). *Compare* note 87 *infra*.

ter v. FCC, 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971). This entails (A) a consideration of the manner in which the past performance of a renewal applicant may be considered under the *CCC* decision and an argument that this consideration entitles RKO to no renewal expectancy (169 U.S.App.D.C. pages —— —— ——, 515 F.2d pages 706–710); (B) a discussion of the subliminal process the Commission used to avoid a comparative decision and to grant an illegal renewal expectancy (169 U.S.App.D.C. pages —— —— ——, 515 F.2d pages 710–713); (C) an argument that the Commission failed to follow its own precedent in its ruling on the diversification of ownership comparative factor (169 U.S.App.D.C. pages —— —— ——, 515 F.2d pages 713–717); and (D) a review of a passel of related errors which taken together strongly indicate that the Commission nullified the comparative hearing process (169 U.S.App.D.C. pages —— —— ——, 515 F.2d 713 pages 717–721). Second, I suggest that the Commission improperly denied a hearing on a specialized programming issue raised by Fidelity Television, Inc., the other comparative participant, on extremely technical grounds and in contravention of our recent decision in Citizens Committee to Save WEFM v. FCC, 165 U.S.App.D.C. ——, 506 F.2d 252 (1974) (en banc). This involves (A) a consideration of the grounds upon which the programming issue was denied and a rejection thereof (169 U.S.App.D.C. pages —— —— ——, 515 F.2d pages 721–725); and (B) a review of First Amendment issues implicated by consideration of past and proposed programming in comparative hearings (169 U.S.App.D.C. pages ——, ——, 515 F.2d pages 725–726).

## I. *RKO General Was Granted an Illegal Renewal Preference*

2. *See* RKO General, Inc., 31 F.C.C.2d 70 (1971).

3. The history of the extraordinary delay in this case is discussed in Fidelity Television, Inc. v. FCC, 163 U.S.App.D.C. 441, 502 F.2d 443 (1974).

## A. *CCC and the Permissible Extent of Renewal Expectancies*

As the court explains, RKO General, Inc., a wholly owned subsidiary of the General Tire and Rubber Company, was until 1965 the licensee of KHJ–TV, Channel 9 in Los Angeles. On August 31, 1965, RKO filed an application for renewal of its license for KHJ–TV. On October 25, 1965, Fidelity Television, Inc., filed a mutually exclusive application for a construction permit to operate Channel 9. The two applications were set down for a comparative hearing. There then ensued four years of litigation over Fidelity's attempts to enlarge the issues to be heard in the comparative hearing. The result of this litigation is described and criticized in Part II. On August 13, 1969, the Hearing Examiner recommended that Fidelity's application be granted and that RKO's application be denied. Two further years of delay ensued as the Commission pondered whether to reopen the record at the comparative hearing to take further evidence of anti-competitive violations by General Tire. Having decided against this course of action,[2] the Commission then delayed decision for two further years. After prodding from this court, the Commission finally issued its decision almost another year after that.[3] This decision declined to accept the Hearing Examiner's recommendation and instead granted RKO's renewal application and denied Fidelity's application.[4] The vote in the Commission was 3–2, with the deciding vote being cast by Chairman Burch who concurred in the result of the majority only and not the opinion issued.

Accepting for the moment the scope of the hearing held and the propriety of the Commission's treatment of the standard comparative issues, the *ratio decidendi* of the Commission was this:[5]

4. RKO General, Inc., 44 F.C.C.2d 123 (1973).

5. *Id.* at 136–37 (emphasis added).

From our consideration of these [applications] up to this point, we have established that each applicant is basically qualified to be a licensee, that the characteristics of the [applications] differ in certain respects, but that *none of those differences provides a basis for making a choice* between the two applicants in this proceeding. Nonetheless a selection must be made, and so we shall look to other aspects of the record affecting the public interest. In this connection, we believe that recognition must be given to the rights and expectancies of an ordinary renewal applicant. . . .

[In light of RKO's substantial investment in the station to make the Channel viable and in light of the renewal expectancies of RKO], we believe that there is a public interest, both in the Los Angeles area and the nation at large, in insuring the predictability and stability of broadcast service. If there is no such security for applicants seeking facilities with the intention of providing good service to the public, the overall development and motivation of the industry will suffer. . . . [We] are persuaded that credit must be given in a comparative renewal proceeding, when the applicants are otherwise equal, for the value to the public in the continuation of existing service. . . . [Since] the record is clear that Fidelity has not demonstrated that it will in fact provide a better service than RKO, we are convinced, for the reasons set forth above, that RKO's renewal application . . . must be preferred.

Initially, it appears that the court misapprehends this rationale for decision. The reader may wish to compare the foregoing quotation with the following representation of it in the court's opinion:[6]

On the whole it is fair to say that the Commission found that the ultimate effect of its analysis of the record was that Fidelity and RKO were essentially poor contenders—or,

at the best, both were minimally acceptable applicants. . . . [We] cannot say that [the Commission] committed legal error when, in its attitude as of the times pertinent in this case, it took the view that 'minimal service is to be preferred to no service at all.' *Compare* Broadcast License Renewal Act, H.Rep.No.93–961, 93d Cong., 2d Sess. 17 (1974). There is no need here to expand on 'renewal expectancies.' We are not faced with a situation where a superior applicant is denied a license because to give it to him would work a 'forfeiture' of his opponent's investment. We merely confirm what we intimated in [Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 854, 859 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)]—that, when faced with a fairly and evenly balanced record, the Commission may, *on the basis of the renewal applicant's past performance*, award him the license.

The court does not inform us from whence comes the quote "minimal service is to be preferred to no service at all." It surely does not come from the Commission's opinion. The Commission referred to the value of "continuation of existing service" and not to the value of minimal service over no service at all. And indeed it had no other choice since we confront here not a petition to deny—where the value of minimal service over no service at all is certainly relevant—but rather a *comparative hearing*—where the issue is not the existence of service but rather who shall provide it. Why the court finds no need to "expand upon renewal expectancies" is not at all clear to me, since I read the Commission as basing its decision squarely on renewal expectancies.

The court suggests that the Commission's decision was based on a rule that among equal applicants, the renewal applicant may be preferred on the basis of "past performance." First, the court's point about the non-superiority of Fidelity's application is entirely circular since

6. 169 U.S.App.D.C. pages ——, ——, 515 F.2d pages 702 (emphasis added).

that issue can only be determined by making a comparative evaluation. But the Commission's decision, as the quoted excerpt shows, did not make a comparative decision since it chose largely on the basis of "renewal expectancies." In other words, Fidelity's application was not "superior" simply because the Commission never decided whether it was! As is discussed in more detail on pages 169 U.S.App.D.C. pages ——, ——, 515 F.2d pages 710, 711, *infra*, use of the renewal expectancies, clearly relied upon by the Commission, completely short-circuits the comparative evaluation process. Hence, the Commission did not choose between "equal" applicants since the very notion of a comparative choice requires that one applicant be "more equal" than others. The question is why is that applicant better. To that question, the Commission's only answer is "renewal expectancies."

Second, the Commission did not, repeat did not, award renewal to RKO on the basis of RKO's past performance. The previously quoted excerpt should make that point clear. If further proof is needed, the following additional quote should provide it: [7]

[We] are persuaded that there are sufficient good points to offset the less favorable aspects of KHJ–TV's performance and that, on balance, its record must be deemed to be within the bounds of average performance expected of all licensees, *thus warranting neither a preference nor a demerit.*

Earlier in its opinion, the court expressly affirms this holding.[8] Indeed, both the Commission and the court had to labor valiantly, for what purpose I do not know, to overturn the Examiner's finding that RKO deserves demerit for its past performance.[9] The Commission's decision is based purely on renewal expectancies, on the value of "continuation of existing service."

The issue thus delineated is whether the Commission may use the value of "continuation of existing service", quite apart from the quality of that existing service, as a factor in comparative renewal hearings. Initial reference to the relevant statutory provisions would indicate that this factor is legally irrelevant.[10] However, early Commission practice was to grant a basically insuperable advantage to the incumbent on the basis of past performance.[11] Thus, ad-

---

7. RKO General, Inc., 44 F.C.C.2d 123, 133 (1973). Presumably, if the Commission had in fact made a comparative decision, RKO's past record would be entitled to some weight in comparison with Fidelity's advantages.

8. 169 U.S.App.D.C. pages ——, ——, 515 F.2d pages 699, 700. At —— U.S.App.D.C. at page ——,515 F.2d at 700, the court makes the rather opaque statement that RKO's past performance as a licensee in the areas of integration, diversification and local ownership as well as past programming performance are to be considered as part of the renewal applicant's past performance. This statement is confusing. Of course, the renewal applicant's proposal, as well as a new applicant's proposal, will be scrutinized and compared on the above-mentioned factors. But such factors have no significance in regard to a renewal expectancy engendered by past performance. And, of course, RKO's "past performance" on those factors is dreary indeed.

9. *See* RKO General, Inc., 44 F.C.C.2d 123, 130–33 (1973); 169 U.S.App.D.C. pages ——, ——, 515 F.2d pages 699–700.

10. *See* 47 U.S.C. §§ 301; 304; 307(d); 309(h)(1) (1970), *quoted and discussed* Citizens Communications Center v. FCC, 145 U.S. App.D.C. 32, 447 F.2d 1201, 1209 n.23 (1971).

11. *Hyde, FCC Policy and Procedures Relating to Hearings On Broadcast Applications in Which a New Applicant Seeks to Displace A Licensee Seeking Renewal,* 1975 Duke L.J. 253, 256–61. *See also* Citizens Communications Center v. FCC, 145 U.S.App.D.C. 32, 447 F.2d 1201, 1207–08 (1971); Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 854–858 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); WOKO, Inc. v. FCC, 80 U.S.App.D.C. 333, 153 F.2d 623, 629–30, rev'd on other grounds, 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204 (1946). *Compare* these statements *with* FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 84 L.Ed. 869 (1940); Crowder v. FCC, 130 U.S.App.D.C. 198, 399 F.2d 569, 571, cert. denied, 393 U.S. 962, 89 S.Ct. 400, 21 L.Ed.2d 375 (1968); Transcontinental Television Corp. v. FCC, 113 U.S.App. D.C. 384, 308 F.2d 339, 341–42 (1962); American Broadcasting Co. v. FCC, 89 U.S.App.D.C.

ministrative practice, confirmed by the courts, was that some consideration must be given to incumbency or renewal expectancies. The question became not whether renewal expectancies were to be recognized but what was the proper consideration of renewal expectancies.

This court provided the framework for analysis of that issue in Citizens Communications Center v. FCC, 145 U.S.App. D.C. 32, 447 F.2d 1201 (1971). There we considered a Commission policy of refusing to assess the comparative qualifications of competing applicants in renewal hearings until after the Commission had determined whether the incumbent licensee had performed "substantial service." If the licensee had performed such service, then renewal was granted without consideration of comparative factors. If the licensee did not so perform, a full comparative hearing was held.[12] We rejected this policy as inconsistent with the statutory and caselaw requirement for a full comparative hearing on the qualifications of competing applications. This holding was not purely formal: the right to a full comparative hearing involved not only the right to present a competing application but also *the duty of the Commission to make a decision on the basis of a comparative examination of the competing applications.*[13] The *CCC* case thus establishes that the Commission may not use renewal expectancies of incumbent licensees to shortcircuit the comparative hearing

In particularly famous dicta, the *CCC* court defined the proper consideration of renewal expectancies:[14]

We do not dispute, of course, that incumbent licensees should be judged primarily on their records of past performance. Insubstantial past performance should preclude renewal of a license. . . . At the same time, *superior* performance should be a plus of major significance in renewal proceedings. The court recognizes that the public itself will suffer if incumbent licensees cannot reasonably expect renewal when they have rendered superior service.

The statement reflected administrative practice (or, at least, stated administrative practice) and was quickly adopted by the Commission after the *CCC* decision.[15] This form of "renewal expectancy" fitted easily into the doctrinal framework established in *CCC*. A licensee's past performance was clearly indicative of potential as a licensee and thus must be given comparative weight against a challenger's advantages in proposed programming, ascertainment efforts, diversification or whatever. The proper weight to be given to past performance is, of course, a matter for the Commission's judgment.

298, 191 F.2d 492, 496–97 (1951), *quoting* Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 331–32, 66 S.Ct. 148, 90 L.Ed. 108 (1945); FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 137–38, 60 S.Ct. 437, 84 L.Ed. 656 (1940); L. B. Wilson, Inc. v. FCC, 83 U.S.App.D.C. 176, 170 F.2d 793, 798 & n.5 (1949).

**12.** Policy Statement Concerning Comparative Hearings Involving Regular Renewal Applicants, 22 F.C.C.2d 424, recon. denied, 24 F.C.C.2d 383 (1970).

**13.** Citizens Communications Center v. FCC, 145 U.S.App.D.C. 32, 447 F.2d 1201, 1212 (1971), *citing* Johnston Broadcasting Co. v. FCC, 85 U.S.App.D.C. 40, 175 F.2d 351, 356–57 (1949).

**14.** 447 F.2d at 1213 & n.35.

**15.** *See* Formulation of Policies Relating to the Broadcast Renewal Applicant, 31 F.C.C.2d 443,

444 & n.1 (1971), mandamus denied, Citizens Communications Center v. FCC, 149 U.S.App. D.C. 419, 463 F.2d 822 (1972) *referencing* Formulation of Policies Relating to the Broadcast Renewal Applicant, 27 F.C.C.2d 580, 582 (1971) *and* Policy Statement Involving Regular Renewal Applicants, 22 F.C.C.2d 424, 425 & n.1 (1970). *See also* A. H. Belo Broadcasting Corp., 40 F.C.C.2d 1131 (1973), on further proceedings, 47 F.C.C.2d 540 (1974); Moline Television Corp., 31 F.C.C.2d 263 (1971).

This kind of renewal expectancy is supported by the various statements of this court on the issue. *See, e. g.,* Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 854, 859 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); Office of Communications of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994, 1007 (1966).

It is obvious, and the Commission does not seriously deny it, that RKO is entitled to no renewal expectancy under the reasoning of *CCC* ostensibly adopted by the Commission. RKO barely avoided a finding of insubstantial service and received only a lukewarm finding of "average" performance which deserved neither merit nor demerit.[16] RKO would not be entitled to a finding of "substantial" service under the Commission's post-*CCC* suggested guidelines.[17] And, as established above, the Commission did not find that RKO was entitled to renewal on the basis of past performance. Indeed, the renewal expectancy granted to RKO had nothing to do with RKO's own performance as a licensee, but rather was premised upon a general policy of ensuring the "continuation of existing service" unless a challenger proved that it would "in fact" provide better service than the existing licensee.

We thus have seen that the renewal expectancy awarded to RKO is quite distinct from that approved in *CCC* and accepted by the Commission. It remains to be seen whether that renewal expectancy is inconsistent with the holding and reasoning of *CCC* and the Federal Communications Act.

B. *The Renewal Expectancy Granted to RKO Shortcircuits the Comparative Hearing Procedure*

The first thing one notices about the renewal expectancy granted to RKO and considered in this comparative hearing is that it has nothing whatsoever to do with RKO's comparative merit as a licensee. Rather it is a general policy, existing wholly apart from RKO, which mandates that renewal will be granted unless a challenger proves that it will "in fact" provide better service than the existing licensee. Initially, we may strike the "unless" clause off the last sentence. The comparative factors in general are designed to determine which competing applicant will provide the "best practicable service."[18] And, indeed, the Commission has affirmed that the factor of diversification of ownership of communications facilities is a factor above and beyond the "best practicable service" determination.[19] Thus, the comparative hearing process is designed to determine whether the challenger will, under the only predictors the Commission recognizes, "in fact" provide better service. The issue is whether the grant of a renewal expectancy such as was given to RKO itself *prevents that determination.* I think it does.

The whole of the Commission's effort in its opinion prior to the passage quoted in Part A above is to establish that neither applicant has a significant advantage over the other. Making the heroic assumption that the Commission succeeded in this effort, it still must, under *CCC,* make a comparative choice; it must make a selection. The mandate of the Act is that the Commission must choose and it has on previous occasions managed to choose on the basis of fairly equal records.[20] But it is at precisely

---

16. *See* p. 6 & nn. 7–9, 169 U.S.App.D.C. page —— & nn. 7–9, 515 F.2d pages 690–692 & nn. 7–9. *supra.*

17. *Compare* Formulation of Policies Relating to the Broadcast Renewal Applicant, 27 F.C. C.2d 580, 582 (1971) *with* RKO General, Inc., 44 F.C.C.2d 149, 161, 173–77 (1969) (Hearing Exam.) (discusses in detail RKO's programming in the various categories of programming identified in Network Programming Inquiry, 25 Fed.Reg. 7291 (1960)). The court, 169 U.S.App.D.C. at page —— n.36, 515 F.2d page 699 n.36, makes the assertion that the Hearing Examiner "expressed the belief" that RKO would have met standards of "substantial service" if they had existed. However, reference to the Examiners opinion, 44 F.C.C.2d at 228, reveals that this was no more than an

expression of confidence that RKO would have upgraded its station to meet the established standards, if such standards had existed, and is not any suggestion, much less a holding, that RKO engaged in substantial service within the intendment of the 1971 proposed guidelines.

18. *See* Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 394, 395–98 (1965).

19. *See* .Terre Haute Broadcasting Corp., 25 F.C.C.2d 348, 353–55 (1970).

20. *See, e. g.,* Star Television, Inc. v. FCC, 135 U.S.App.D.C. 71, 416 F.2d 1086, cert. denied, 396 U.S. 888, 90 S.Ct. 171, 24 L.Ed.2d 163 (1969) aff'g Flower City Television Corp., 9 F.C.C.2d 249, recon. denied, 10 F.C.C.2d 718

this point that the Commission pulls up short and refuses to make a comparative choice, holding that when in doubt it must renew. As I have stated, the renewal expectancy granted to RKO has nothing to do with its comparative qualifications and thus use of that factor may not be justified as simply one more element in the comparative balance. So, the use of the renewal expectancy prevents the challenger from making its case that it will in fact be a better licensee by forestalling the comparative decision which will establish the challenger's contention. This Catch-22 reasoning completely shortcircuits the comparative decision process since it avoids the "overall relative determination upon an evaluation of all factors"[21] which is the *sine qua non* of comparative licensing.

It is no answer to this analysis to assert that the Commission simply imposed a "burden of proof" on the challenger to prove that it is better qualified under the comparative criteria. First, the Commission has not heretofore ever informed challengers that they have a special burden of proof which exists wholly apart from the comparative criteria and, as far as one can tell from the language of the reports, has never expressly applied such a "burden of proof." The Commission advances no reasons in its opinion for departing from its prior practice and none are apparent. Thus, the matter should at least be remanded for that purpose.[22] Second, it is clear that the Commission did not truly use the renewal expectancy as a "burden of proof." Nowhere does the Commission make a comparative judgment between the two applicants, even with a burden of proof on Fidelity. Its whole discussion goes only to prove that RKO is qualified to be a licensee and is entitled to a renewal expectancy. Indeed, the Commission expressly refuses to make a comparative judgment, saying by fiat that none of the differences in the applications provide the basis for making a choice.[23] The Commission nowhere provides any reasoned comparison of these differences; it treats the advantages and disadvantages of the two applicants but makes no comparison. To be sure, the Commission asserts that none of the parties are entitled to a preference or a demerit, as if those two concepts were all or nothing issues. But it never holds that in comparison to each other, Fidelity or RKO should have some advantage or disadvantage because of, respectively, diversification or past performance. And, as will be developed in Parts C and D below, there are very significant differences between the applicants which even under the Commission's reasoning could provide the basis for a comparative choice.[24]

But more important than these two points, I would hold that the renewal expectancy granted to RKO violates the

(1967); Community Broadcasting Corp. v. FCC, 124 U.S.App.D.C. 230, 363 F.2d 717 (1966); Tennessee Television, Inc. v. FCC, 104 U.S.App.D.C. 316, 262 F.2d 28 (1958); Pinellas Broadcasting Co. v. FCC, 97 U.S.App.D.C. 236, 230 F.2d 204, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956); W. S. Butterfield Theatres, Inc. v. FCC, 99 U.S.App.D.C. 71, 237 F.2d 552 (1956).

21. Johnston Broadcasting Co. v. FCC, 85 U.S.App.D.C. 40, 175 F.2d 351, 357 (1949).

22. *See* Garrett v. FCC, 168 U.S.App.D.C. 266, 513 F.2d 1056 (1975); Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. 175, 454 F.2d 1018, 1026 (1971); *see also* Local 814, Teamsters v. NLRB, 167 U.S.App.D.C. 387, 512 F.2d 564, 571–72 & n.15 (1975) (Bazelon, C. J. concurring in part, dissenting in part) and authorities cited.

23. RKO General, Inc., 44 F.C.C.2d 123, 137 (1973).

24. This point might, at first glance, appear too attenuated. If the reader has this reaction, I would suggest a comparison between the cases cited in note 20 *supra* and the discussion in Parts C and D *infra* in regard to their treatment of relative "preferences" and "demerits." Reference may also be made to Mid-Florida Television Corp., 33 F.C.C.2d 1, 9–10, 21, review denied, 37 F.C.C.2d 559 (1972), rev'd on other grounds, TV 9, Inc. v. FCC, 161 U.S.App.D.C. 349, 495 F.2d 929 (1973), cert. denied, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974). The Commission clearly could have made a comparative decision but simply did not.

express provisions of the Federal Communications Act relating to renewal expectancies. 47 U.S.C. § 301 (1970) states that "no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license." Other statutory provisions, buttressed by case law, provide reinforcement for this command.[25] The very concept of a three year license demands that the holder be subject to competition at the license's term. To grant an advantage in the comparative hearing process to the incumbent licensee for reasons wholly unrelated to its performance, past and future, nullifies the competition that the three year licensing scheme was designed to preserve. A renewal expectancy based on past performance could in fact encourage competition by providing a safe haven for the diligent licensee. A renewal expectancy not based on past performance will have an opposite result since any competitive spur provided by the three year license will be substantial-

ly eliminated. And, of course, there is no precedent in the Commission or in the courts for a renewal expectancy not based on past performance. I need hardly point out that *CCC* specifically and expressly relied on this competitive spur argument to strike down the Commission's previous renewal policy.[26]

There are substantial antitrust and First Amendment considerations which support my position. As *CCC* expressly recognizes, perhaps the most significant comparative qualification which is ignored by a policy that entrenches the incumbent licensee is diversification of ownership.[27] The diversification guides, the most important single factor in the comparative hearing,[28] constitute the prime legal rule for dealing with the extremely concentrated VHF television market.[29] The guides thus serve both antitrust concerns, in regard to the market for television advertising, and First Amendment concerns by increasing the

25. *See* authorities cited notes 10–11 *supra.*

26. 447 F.2d at 1214.

27. *Id.* at 1213 n.36.

28. Terre Haute Broadcasting Co., 25 F.C.C.2d 348, 353–55 (1970); Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 394 (1965). *See* WHDH, Inc., 16 F.C.C.2d 1, 12–13, on recon., 17 F.C.C.2d 856 (1969), aff'd, Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 859–60 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); Lorain Community Broadcasting Co., 13 F.C.C.2d 106, 114, recon. denied, 14 F.C.C.2d 604, rehearing denied, 15 F.C.C.2d 388 (1968), review denied, 18 F.C.C.2d 686 (1969), aff'd, Allied Broadcasting, Inc. v. FCC, 140 U.S.App.D.C. 264, 435 F.2d 68, 69 (1970); Ultravision Broadcasting Corp., 11 F.C.C.2d 394, 410–11 (1968), aff'd, WEBR, Inc. v. FCC, 136 U.S.App.D.C. 316, 420 F.2d 158 (1969). *See generally* TV 9, Inc. v. FCC, 161 U.S.App.D.C. 349, 495 F.2d 929, 938 (1973), cert. denied, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974).

29. *See* Hale v. FCC, 138 U.S.App.D.C. 125, 425 F.2d 556, 562 & n.2 (1970) (Tamm, J. concurring); Bennett, *Media Concentration and the FCC: Focusing with a Section Seven Lens,* 66 Nw.U.L.Rev. 159, 181–86 (1971). *See also* R. Noll, M. Peck & J. McGowan, Economic Aspects of Television Regulation 15–16, 104–06 (1973); House Comm. on Interstate and For-

eign Commerce, Report on Network Broadcasting, H.R.Rep. No. 1297, 85th Cong., 2d Sess. 559–75 (1958); Barnett, *Cable Television and Media Concentration, Part I,* 22 Stan.L. Rev. 221 (1970). Failure to grant significant weight to a diversification advantage in a comparative renewal hearing would tend to entrench this present pattern of concentration of control by eliminating the prospect of potential competition on the edge of the market. Elimination of this "edge effect" has been one factor that has weighed heavily in more recent anti-trust case law. *See* United States v. Marine Bancorporation, Inc., 418 U.S. 602, 623–41, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); United States v. Falstaff Brewing Corp., 410 U.S. 526, 532–37, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) and sources cited. If one inspects the Los Angeles viewing and advertising market for VHF and daily newspapers (on this definition of the relevant market, *see* Multiple Ownership of Standard, FM and Broadcast Television Stations, 50 F.C.C.2d 1046, 1056, 1077, 1083 (1975)), one finds seven VHF television stations and two daily newspapers, a total of nine competitors. Elimination of the threat of potential competition from a market structured in this manner would surely fall within the rule of the cases cited previously on "edge effect," although the elimination of potential competition does not occur in a merger context.

number of diverse speakers.[30] The diversification guides serve First Amendment concerns in another manner as well. The passle of program regulation policies presently enforced by the FCC would violate the First Amendment in any context other than telecommunications. The justification for providing a different First Amendment regime to the telecommunications field is the alleged "scarcity" of broadcast speakers, a scarcity which if the truth were known is a product of the extremely concentrated VHF television market.[31] Failure to effectively deal with the concentrated VHF television market will only increase the pressure for more program control. We thus erode our First Amendment freedoms in two ways by a refusal to enforce the diversification guides.

I conclude from the foregoing discussion that the court's decision in the present case is inconsistent with *CCC* both because it shortcircuits the comparative hearing process and because it eliminates the competitive spur upon which *CCC* relied in significant part in its holding. Moreover, I think the renewal expectancy granted to RKO violates the Federal Communications Act independently of *CCC*. A review of the Commission's treatment of the diversification guides in the present case provides additional evidence that the Commission both shortcircuited the comparative hearing process and violated the Federal Communications Act with its renewal expectancy for RKO.

### C. The FCC Failed to Follow Its Own Precedent In Its Ruling on Fidelity's Diversification Advantage

The FCC has traditionally granted a significant comparative advantage to an applicant which possesses no other media interests over an applicant which does possess other media interests. In its 1965 Policy Statement on Comparative Broadcast Hearings, the Commission had this to say about the diversification guides: [32]

> We believe there are two primary objectives toward which the process of comparison should be directed. They are, first, the best practicable service to the public, and, second, a maximum diffusion of control of the media of mass communications. . . . Since independence and individuality of approach are elements of rendering good program service, the primary goals of good service and diversification of control are also fully compatible.

> As in the past, we will consider both common control and less than controlling interests in other broadcast stations and other media of mass communications. The less the degree of interest in other stations or media, the less will be the significance of the factor. Other interests in the principal community proposed to be served will normally be of most significance, followed by other interests in the remainder of the proposed service area and finally, generally in the United States. However, control of large interests elsewhere in the same state or region may well be more significant than control of a small medium of expression . . . in the same community. The number of other mass communications outlets *of the same type* in the community proposed to be served will also *affect to some extent* the importance of this factor in the general comparative scale.

**30.** *See* Citizens Comm. to Save WEFM v. FCC, 166 U.S.App.D.C. 191, 209–211, 506 F.2d 252, 270–72 (1974) (Bazelon, C. J., concurring in the result); TV 9, Inc. v. FCC, 161 U.S.App.D.C. 349, 495 F.2d 929, 937–38 (1973), cert. denied, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974); Multiple Ownership of Standard, FM and Television Broadcast Stations, 50 F.C.C.2d 1046, 1048 (1975) and *id.* at 1116, 1119 (Robinson, Comm'r, concurring in part, dissenting in part), *citing* Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

**31.** *See* Bazelon, *FCC Regulation of the Telecommunications Press, 1975* Duke L.J. 213, for a complete discussion of this point.

**32.** Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 394–95 (1965).

The diversification issue is a standard comparative issue and was duly considered by the Hearing Examiner and the Commission.

The following facts were developed. RKO was the licensee of standard, FM *and* broadcast television licenses in New York City (# 1 viewing market in the country); Los Angeles (# 2 viewing market); Boston (# 5 viewing market); Windsor, Ontario (serving # 6 Detroit market) and Memphis (# 45 viewing market). RKO was the licensee of standard and FM stations in Washington-Bethesda (# 9 viewing market) and San Francisco (# 10 viewing market). RKO has controlling interests in a massive number of CATV franchises serving almost 100 cities and towns. Several towns are within the Grade B contour of Channel 9. RKO has other media interests, including microwave communications facilities, a chain of movie theaters, programming and advertising services and a small interest in a newspaper in Schenectady, New York. Fidelity has no other media interests. A 3% stockholder of Fidelity has a 10% interest in a CATV franchise 50 miles from Los Angeles. That is the extent of Fidelity's media interests.[33]

From these facts, the FCC reached the miraculous conclusion that neither applicant was entitled to a diversification "preference." Before indicating the absurdity of this conclusion, it is necessary to point out that this finding of no "preference" does not mean that if a comparative evaluation were made, Fidelity would have no advantage on diversification. If the FCC had in fact made a comparative determination, a di-

versification advantage of some kind would clearly be required. The Commission avoids this, by avoiding a comparative decision, as was noted in Part B above. As will be seen, all the Commission's arguments against Fidelity's "preference" or diversification advantage serve only to reduce its significance, not eliminate it entirely. The vestige is eliminated not by arguments directed to diversification policies but by avoidance of a comparative decision.

Taking a deep breath, I note the following arguments for reducing Fidelity's diversification advantage. First, the Commission points out that there are 15 television stations, 126 radio stations and numerous newspapers within Channel 9's signal contour. Second, the Commission finds that RKO has never sought to influence the operation of KHJ–TV to promote a uniform expression of views. Third, the Commission will not attempt to restructure the broadcast industry in comparative hearings.[34] These reasons are completely and utterly inconsistent with every reported comparative decision my office has been able to locate. Perhaps it is the unmitigated audacity of the Commission that stuns the court into accepting its sweeping repeal of the diversification guides. Whatever the reason, it is beyond cavil that the Commission's reasoning will simply not bear analysis unless one makes the assumption that it has *sub silentio* repealed the guides.

First, as the 1965 Policy Statement clearly provides and as has been followed in every case decided since its promulgation,[35] the existence of other media *of*

---

**33.** The FCC asserts that another stockholder of Fidelity of an unstated interest has a 26% interest in a corporation publishing "newspapers" in the Los Angeles suburbs. RKO General, Inc., 44 F.C.C.2d 123, 133 (1973). The court properly holds that the Commission committed error in considering this "fact" since Fidelity was denied a hearing on its assertion that these "newspapers" were simple advertising "throwaways." 169 U.S.App.D.C. page —— n.42, 515 F.2d page 701 n. 42.

**34.** RKO General, Inc., 44 F.C.C.2d 123, 133–34 (1973).

**35.** *See* Terre Haute Broadcasting Corp., 25 F.C.C.2d 348, 349, 350–51 (1970); WHDH, Inc., 16 F.C.C.2d 1, 12–13, recon. denied, 17 F.C.C.2d 856 (1969), aff'd, Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 859–60 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); Ultravision Broadcasting Corp., 11 F.C.C.2d 394, 410–11 & n.29 (1968), aff'd, WEBR, Inc. v. FCC, 136 U.S.App.D.C. 316, 420 F.2d 158 (1969). While ultimately not awarding the license to the applicant with the diversification advantage, the Commission affirmed the prop-

*the same type* in the community may be weighed *to some extent.* However, the existence of other outlets neither cancels a diversification advantage, nor indeed renders it insubstantial. This principle has been applied in cites such as Boston, Terre Haute, and Buffalo.[36] And no other conclusion would be plausible considering the express provision in the Policy Statement[37] and recent cases[38] that the diversification guides are directed to concentration of control in the nation and several regions, not only within a

viewing market. In fact, this policy is implicit in the group ownership and chain broadcasting rules.[39] Even if all this were wrong, we would still want to consider how many of those other outlets in Los Angeles are truly independent. We know that at least two are owned by RKO itself and three VHF television licensees are owned by the three major networks as flagship stations, as well as an unknown number of radio stations.

Second, none, repeat none,[40] of the cases considering the diversification

osition that other media outlets only discount the diversification preference and do not at all eliminate it in Mid-Florida Television Corp., 33 F.C.C.2d 1, 9–10, recon. denied, 37 F.C.C.2d 559 (1972), rev'd on this ground in part for failure to give complete consideration to diversification, TV 9, Inc. v. FCC, 161 U.S.App.D.C. 349, 495 F.2d 929 (1973), cert. denied, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974), *citing* Flower City Television Corp., 9 F.C.C.2d 249, 254, recon. denied, 10 F.C.C.2d 718 (1967), aff'd, Star Television, Inc. v. FCC, 135 U.S. App.D.C. 71, 416 F.2d 1086, cert. denied, 396 U.S. 888, 90 S.Ct. 171, 24 L.Ed.2d 163 (1969). *See also* Brandywine-Main Line Radio, Inc. v. F. C. C., 153 U.S.App.D.C. 305, 473 F.2d 16, 28 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973) (only inquiry under Fairness Doctrine is balance within a licensee's own programming and not in the viewing market as a whole).

36. *See* cases cited note 35 *supra.*

37. Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 394–95 (1965).

38. Billy T. Pirtle, 43 F.C.C.2d 670, 671 (1973), *citing* Snake River Valley Television, Inc., 26 F.C.C.2d 380 (1970). *See* Alvin L. Korngold, 45 F.C.C.2d 1, 4–5 (1974); The News-Sun Broadcasting Co., 24 F.C.C.2d 770, 775–76 (1970); East St. Louis Broadcasting Co., 19 F.C.C.2d 289, 292–93 (1969). *See also* McKenney v. FCC, 116 U.S.App.D.C. 412, 324 F.2d 444 (1963); McClatchy Broadcasting Co. v. FCC, 99 U.S.App.D.C. 195, 239 F.2d 15 (1956), cert. denied, 353 U.S. 918, 77 S.Ct. 662, 1 L.Ed.2d 665 (1957) (in these cases the court affirmed Commission actions awarding a comparative demerit against an applicant with media ties outside of the service area.) *See generally* Clarksburg Publishing Co. v. FCC, 96 U.S.App.D.C. 211, 225 F.2d 511, 518 (1955).

39. *See* Multiple Ownership of Standard, FM and Television Broadcast Stations, 50 F.C.C.2d 1046, 1049 (1975); Multiple Ownership of Standard, FM and Television Broadcast Stations, 22 F.C.C.2d 306 (1970), on recon., 28 F.C.C.2d 662 (1971); Multiple Ownership of

Standard, FM and Television Broadcast Stations, 18 F.C.C. 288 (1953), mod. Storer Broadcasting Co. v. United States, 95 U.S.App.D.C. 97, 220 F.2d 204 (1955), reinstated, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081, affirmed on remand, 99 U.S.App.D.C. 369, 240 F.2d 55 (1956). *See also* National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Iacopi v. FCC, 451 F.2d 1142 (9th Cir. 1971); Mount Mansfield Television, Inc. v. FCC, 442 F.2d 470 (2d Cir. 1971).

Even when one considers intra-viewing market concentration, RKO would under established precedent be entitled to a substantial diversification demerit. RKO, as stated in the text, owns an AM and an FM station in Los Angeles as well as certain cable franchises within Channel 9's Grade B contour. *See, e. g.,* Industrial Business Corp., 47 F.C.C.2d 891, 892, 897 (1974); Lorain Community Broadcasting Co., 13 F.C.C.2d 106, 114, recon. denied, 14 F.C.C.2d 604, rehearing denied, 15 F.C.C.2d 388 (1968), review denied, 18 F.C.C.2d 686 (1969), aff'd, Allied Broadcasting, Inc. v. FCC, 140 U.S.App.D.C. 264, 435 F.2d 68, 69 (1970). *See also* Scripps-Howard Radio, Inc. v. FCC, 89 U.S.App.D.C. 13, 189 F.2d 677, cert. denied, 342 U.S. 830, 72 S.Ct. 55, 96 L.Ed. 628 (1951).

40. The court makes a rather extraordinary cite to McClatchy Broadcasting Co., 19 F.C.C. 343, 380–81 (1954), aff'd McClatchy Broadcasting Co. v. FCC, 99 U.S.App.D.C. 195, 239 F.2d 15 (1956), cert. denied, 353 U.S. 918, 77 S.Ct. 662, 1 L.Ed.2d 665 (1957) in which the Hearing Examiner relied on the so-called "autonomy" argument to reduce a diversification preference (although not to eliminate it). But the Commission refused to accept that reasoning, reversed the Hearing Examiner's recommendation and awarded to the applicant with the diversification advantage. This court affirmed. Of course, the court is correct that the Commission "considered" whether the licensee had met the goals of diversification by autonomous operation, 169 U.S.App.D.C. page ——, 515 F.2d page 701, but fails to inform the reader that the Commission *rejected* the

guides consider the fact that the owner has not imposed uniform expression of views in ruling on the application of the guides. To do so would run counter to the oft stated maxim of antitrust law that one does not distinguish between "good" monopolists and "bad" monopolists in application of antitrust policy.[41] Moreover, the Commission does not inform us how one defines uniform expression of views as opposed to local expression of views. To make the distinction raises very serious First Amendment questions indeed. Third, the Commission's reference to restructuring of the broadcast industry is entirely gratuitous and conclusory since the diversification guides by their nature will cause restructuring if applied. The reference is thus no more than a bad humored attack on the existence of the guides.

The court affirms this bizarre, vertiginous reasoning by simply incanting it out loud and citing in support two of the leading cases upholding a strict application of the diversification guides. The court does not cite and shows no awareness of the multitude of Commission cases which are inconsistent with this reasoning, even though we have only recently reaffirmed the proposition that the Commission must follow its own precedent or explain why it has not.[42] One possible distinction of these precedents, not mentioned by the court, is that they all involve non-renewal comparative hearings. However, this distinction goes to the weight of a diversification preference in comparison with the past broadcast record of the renewal applicant and does not at all purport, in any case except this one, to affect the ascertainment of a diversification advantage in the first place. The Commission's treatment of the diversification guides in this case truly illumines its intent in erecting the renewal expectancy mentioned in Parts A and B. Without

argument. In the cases cited in notes 28, 35, 38–39 *supra*, there is no evidence of Commission consideration of autonomy in ruling on the weight of a diversification preference. The reasoning of those cases implicitly rejects such a contention. As the *amicus* Citizens Communications Center argues, the autonomy rationale would seemingly nullify the multiple or group ownership provisions, as well as the duopoly rules, since the licensee could argue that it has met the "goals" of the rules by "autonomous" operation. And, as may be evident, the Commission in its decision did not rely on "autonomous" operation so much as the fact that there was no evidence that the control of ownership was exercised to promote a uniform expression of views.

Turning to the Commission's true rationale, it is clear that *ad hoc* inquiry into whether diversification demerits translate into a failure of diversity would require a prescience of what is "uniform" expression of views, a skill the Commission is not required to achieve and which has shown no success in achieving. *Cf.* Multiple Ownership of Standard, FM and Television Broadcast Stations, 50 F.C.C.2d 1046, 1119–21 (1975) (Robinson, Comm'r, concurring). The Commission has followed this approach to a very limited and unsuccessful extent in petitions to deny in cross-ownership situations. *E. g.* Columbus Broadcasting Coalition v. FCC, 164 U.S.App.D.C. 213, 217–218, 505 F.2d 320, 324–25 (1974); Stone v. FCC, 151 U.S.App.D.C. 145, 466 F.2d 316, 331 (1972);

Hale v. FCC, 138 U.S.App.D.C. 125, 425 F.2d 556, 560 (1970). The Commission promoted this approach only as a temporary measure while it examined proposed rules and this court expressly affirmed it on that basis. The adoption of the rules on cross-ownership represent a rejection of the *ad hoc* approach and the expression of a general sentiment that the dangers to diversity because of the *power* gained through concentration is sufficient to prohibit the concentration. Multiple Ownership of Standard, FM and Television Broadcast Stations, 50 F.C.C.2d 1046, 1054 (1975). These rules represent the limit of cross or common ownership as a *disqualification* factor; they are to be extended in comparative hearings through the diversification guides. *Id.* at 1055, 1087–88 (since cross-ownership rules are prospective, in large part, major consideration of diversification in comparative hearings will occur in renewal proceedings).

41. *See* United States v. Socony-Vacuum Oil Co., 310. U.S. 150, 213–14, 221–22, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), *citing* United States v. Trenton Potteries Co., 273 U.S. 392, 397–98, 47 S.Ct. 377, 71 L.Ed. 700 (1927). The policies stated in these two cases, that there is no feasible or efficient manner of administration of monopoly power to ensure against abuses, are applicable to the Commission's logic.

42. *See* sources cited note 22 *supra*.

any supporting reasoning to speak of, the Commission nullifies the diversification guides in comparative renewal hearings and the court, laboring valiantly, sweeps up behind it. And for what purpose we are never told.

Perhaps what underlies this extraordinary holding is the instinctive feeling that despite its substantial diversification advantage, Fidelity is not really that good an applicant. This feeling is apparently based on several comments of the Hearing Examiner to the effect that Fidelity's lack of experience renders it suspect as a licensee.[43] But it should be absolutely clear that no new voice will ever have experience; this is inherent in being new. And if it is an important communications policy to increase the number of diverse voices, speakers, in the telecommunications system, a goal frequently avowed, then we are just going to risk the mistakes of inexperience against the mistakes of a lack of diverse speakers. In any event, the issue cannot be dispositive on this appeal since the Commission did not expressly make it a ground for decision.[44]

### D. *Other Comparative Factors Misapplied By the Commission*

The Commission's mutilation of the diversification guides is, unfortunately, only indicative of its treatment of the other comparative factors. Again, as with the diversification guides, the man-

ner in which the Commission removes Fidelity's advantages or RKO's disadvantages does not fully eliminate the existence of advantages and disadvantages. Rather, as I have said, that is performed by a failure to make a comparative decision.

The Commission takes its hatchet to the "integration of ownership into management" factor and here we get the stench of procedural bias. Fidelity, the Commission admits, has an obvious advantage in this factor. The Commission adduced these reasons for giving Fidelity no "preference" on the factor. First, the Commission notes that the managers of KHJ, while not owners, do have autonomous control of the station. This argument, of course, nullifies the factor and has never been considered to my knowledge in comparative evaluation of the "integration" factor.[45] Even so, this argument says nothing about *Fidelity's* advantage, both through integration and through local ownership and does not even purport to weigh Fidelity's advantage against RKO's.

The Commission's second argument is characterized in Fidelity's brief as a "monstrous abuse of Fidelity's right to due process."[46] This is, if anything, an understatement. The Commission discounts the viability of Fidelity's integration proposal because of the unverified allegations in a Broadcast Bureau and RKO petitions to enlarge issues *which*

---

**43.** See RKO General, Inc., 44 F.C.C.2d 123, 226–27 (1969) (Hearing Exam.). *See* 169 U.S. App.D.C. pages ——–——, 515 F.2d pages 726–729, *infra* and sources cited.

**44.** See SEC v. Chenery Corp., 318 U.S. 80, 92, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *cf.* Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

**45.** See, e. g., Terre Haute Broadcasting Corp., 25 F.C.C.2d 348 (1970); The News-Sun Broadcasting Co., 24 F.C.C.2d 770, 777–78 (1970); WHDH, Inc., 16 F.C.C.2d 1, 13–14, on recon., 17 F.C.C.2d 856 (1969), aff'd, Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C.

383, 444 F.2d 841, 862–63 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); Ultravision Broadcasting Corp., 11 F.C.C.2d 394, 408–09 (1968), aff'd, WEBR, Inc. v. FCC, 136 U.S.App.D.C. 316, 420 F.2d 158 (1969); Flower City Television Corp., 9 F.C.C.2d 249, recon. denied, 10 F.C.C.2d 718 (1967), aff'd, Star Television, Inc. v. FCC, 135 U.S.App.D.C. 71, 416 F.2d 1086, cert. denied, 396 U.S. 888, 90 S.Ct. 171, 24 L.Ed.2d 163 (1969). The Commission's argument nullifies the factor because, of course, there will always be integration of management employees into management; this is a truism. The factor seeks to integrate *owners* into management. Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 395–96 (1965).

**46.** Brief for Fidelity Television, Inc., at 123.

*were denied by the Commission.*[47] Accepting these allegations, although Fidelity never had a chance to dispute them, the Commission states that they demonstrate an "unwillingness or inability to carry out its responsibilities as an applicant" and hence call into question Fidelity's integration proposal. The allegations are that Fidelity was remiss in not informing the Commission that its stock subscription agreements were signed by agents of the owners, failing to secure prompt ratification of documents so signed and in failing to report for 17 months significant changes in the corporate structure of the company. How does the Commission leap from these allegations to the conclusion that Fidelity will not implement its integration proposal? There is no answer to this question in the Commission's opinion. It hardly requires extended reflection to conclude that the allegations go to character but since no character issue was added to the hearing, consideration on that basis would be inappropriate.[48] There is absolutely no demonstrated relation between the allegations and a possible inability to implement the integration proposal. The Commission was arbitrary in the extreme in suggesting (but never overtly stating) that there was. And, of course, even if the relation existed, it would not eliminate Fidelity's advantage in any comparative evaluation but would only affect its weight.

The court wisely ignores this second half of the Commission's butchering of the integration factor. Instead the court returns to the rationale of the Hearing Examiner who held that Fidelity's integration proposal could not be implemented because the management-owners had no broadcast experience. Apparently, neither the court nor the Hearing Examiner consulted the 1965 Policy Statement which advises us this way on that issue: [49]

> Previous broadcast experience, while not so significant as local residence, also has some value when put to use through integration of ownership and management. . . . Since emphasis upon this element could discourage qualified newcomers to broadcasting and since experience generally confers only an initial advantage (Lack of experience, unlike a high concentration of control, is remedial . . .), it will be deemed of minor significance.

This, of course, does not dispose of contentions that an integration proposal can not be implemented but it does call into doubt all the confident assertions by the Hearing Examiner that Fidelity's plan is a "foolish piece of business." [50] And it must be remembered that Fidelity's proposal was only that a Mr. Simon, a 20% stockholder, would be President and General Manager, and that a 2% stockholder would be director of public service programming. The rest of the staff

---

**47.** RKO General, Inc., 22 F.C.C.2d 737 (1970). *See* RKO General, Inc., 44 F.C.C.2d 123, 135 (1973).

**48.** *See* Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 399 (1965).

Fidelity's explanation of these events is recited in the Commission's opinion denying the requested character issue, RKO General, Inc., 22 F.C.C.2d 737 (1970). It appears that *one* member of Fidelity's board of directors did not authorize a signature on a stock subscription but did in fact believe himself committed to a $5,000 investment in the company. The individual did in fact function as a member of the board according to the Commission, although it never held a hearing on any of these issues. The other issues relating to changes in Fidelity's corporate structure were reported late but well before the Commission's decision. The

facts as to the changes may be gleaned only from the pleadings of the parties, which differ substantially. The Commission never resolved the conflicts in the pleading or even commented on them until its apparent acceptance of RKO's version in RKO General, Inc., 44 F.C.C.2d 123, 135 (1973). The additional reference in the Commission's opinion to the late reporting of an alleged "newspaper" interest is completely inappropriate and was so recognized by the court. 169 U.S.App.D.C. page ——, 515 F.2d page 701 n.42; note 33 *supra.*

**49.** Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 396 & n.8 (1965), *citing* Sunbeam Television Corp. v. FCC, 100 U.S.App.D.C. 82, 243 F.2d 26, 29 & n.6 (1957).

**50.** RKO General, Inc., 44 F.C.C.2d 149, 227 (1969) (Hearing Exam.).

would be professional broadcasters. In any event, the court has no authority to affirm the Commission on a ground it itself did not offer. The affirmance is clearly wrong on this point.[51]

We next come to the Commission's treatment of the character issue set down against RKO because of its admitted reciprocal dealings, a violation of Section 5 of the Federal Trade Commission Act and Sections 1 or 2 of the Sherman Act.[52] I simply do not have the space, time or energy to describe the procedural minefield the Commission laid for Fidelity on this point and the numerous backings and fillings, shifting of ground, in the years the Commission sought to avoid consideration of this obvious comparative and non-comparative issue. Suffice it to list the admitted facts after the dust had settled. The Commission found that on the basis of an extremely myopic view of the evidence RKO's reciprocal dealing violations were limited to mutual patronage situations. It then concluded that such reciprocal dealings were not at that time clearly illegal under the antitrust laws and thus the Commission would not charge RKO with "knowing and willful misconduct."[53] Furthermore, since many corporations have engaged in such violations, since RKO is presently under an injunction in regard to such practices

and since RKO has an "unblemished" record as a broadcaster for 25 years, the Commission will not assess a comparative demerit.[54] The court in affirming takes a slightly different tack. The court independently concludes, without the aid of either the Hearing Examiner or the Commission, that "most" of the reciprocal dealings were ineffective and those that were effective "have little to do with RKO."[55] The court recognizes that reciprocal dealing was declared illegal in 1965 at a minimum and probably much earlier, thus implicitly discounting the Commission's logic.[56] On the basis of this analysis, the remark that "KHJ was only a small part of what went on" and the clearly incorrect assertion that "antitrust considerations are only one segment of the Commission's concern with the character", the court holds the FCC did not act arbitrarily.[57]

The court is clearly mistaken in its assertions about the nature of the reciprocal dealings. Both the Commission and the Hearing Examiner found completed acts of at least mutual patronage involving KHJ that resulted in significant advertising revenues to the station.[58] These acts clearly violate Section 5 of the Federal Trade Commission Act and at least after 1965, violate the Sherman Act.[59] The Commission is ex-

**51.** See sources cited note 44 supra.

**52.** 15 U.S.C. §§ 1, 2, 45 (1970); see discussion in note 59 infra.

**53.** RKO General, Inc., 44 F.C.C.2d 123, 130 (1973).

**54.** Id. The Commission's reference to RKO's "unblemished" record is somewhat baffling since it had just finished concluding that RKO had engaged in illegal acts, had only an average past record (at best) and was the member of a sizeable communications conglomerate. What does the Commission think is a "blemished" record?

**55.** 169 U.S.App.D.C. page ——, 515 F.2d page 698.

**56.** Id. 169 U.S.App.D.C. pages ——, ——, 515 F.2d pages 697, 698.

**57.** Id. 169 U.S.App.D.C. pages ——, ——, 515 F.2d page 698.

**58.** In particular, the record establishes that General Tire, RKO's parent company, engaged in successful mutual patronage reciprocity with Pepsi-Cola, Olin Mathieson, Alcoa, American Airlines and Hertz that resulted in significant (respectively, $36,500, $12,350, $8,069, $9,650 to $14,500, $15,210 to $90,025) increases in KHJ advertising revenues. See RKO General, Inc., 44 F.C.C.2d 149, 202–04, 210–11, 212–15 (1969), summarized, 44 F.C.C.2d 123, 143 (1973) (Lee, Comm'r, dissenting). The Commission itself stated: "Thus, the question here is not whether reciprocal dealing was practiced with respect to KHJ–TV, but whether this conduct should reflect adversely upon the operation of the station." Id. at 129.

**59.** See FTC v. Consolidated Foods Corp., 380 U.S. 592, 594–95, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); Allis-Chalmers Mfg. Co. v. White Consol. Industries, Inc., 414 F.2d 506, 518–19 (3d Cir. 1969); California Packing Corp., 25 F.T.C. 379 (1937). In Consolidated Foods, the Supreme Court found a merger violated Section 7 of the Clayton Act because of the possibility of reciprocal dealing. If the possibility of recip-

pressly commanded to enforce the anti-trust laws against licensees.[60] Even beyond this, use of reciprocal dealing to obtain advertising reduces the incentive to meet the needs of the public since

advertising is garnered by economic power and not successful competition.[61] When one considers the fact that RKO was found to have engaged in overcommercialization,[62] the seriousness of the

rocal dealing is sufficient to set aside a merger, it must certainly follow that actual engagement in reciprocal dealing would violate some provisions of the anti-trust laws. Lower courts since *Consolidated Foods* have concluded that Sections 1 and 2 of the Sherman Act are offended by reciprocal dealing. *See* W. L. Gore & Assoc. v. Carlisle Corp., 381 F.Supp. 680, 703 (D.Del.1974); United States v. General Dynamics Corp., 258 F.Supp. 36, 57–59 (S.D.N.Y.1966). This seems a fairly uncontroversial extension of the cases outlawing tying arrangements (reciprocity being simply a form of tying). *See* Fortner v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Northern Pacific R.R. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Indeed, the Supreme Court in *Consolidated Foods,* in declaring reciprocity an unlawful consequence of a merger, specifically relied on the reasoning of the tie-in cases. 380 U.S. at 594, 85 S.Ct. 1220. And even if it does not violate the Sherman Act, reciprocity clearly violates Section 5 of the Federal Trade Commission Act. Since mistake of law is not a defense to civil or criminal charges, *see* United States v. Barker, 168 U.S.App.D.C. ——, 514 F.Supp. 208 (1975) (Bazelon, C. J., concurring), in most circumstances, it requires some fairly extraordinary leaps of faith to excuse RKO's clear violations of the antitrust laws. And it must be remembered that we are discussing not disqualification, where "knowing" misconduct is particularly relevant (although mistakes of law are not generally part of the "knowing" requirement), but only comparative evaluation.

The Commission's off-the-cuff assertion in *RKO General, Inc.,* 44 F.C.C.2d 123, 130 n.21 (1973) that an insufficient amount of commerce was affected to bring to bear the sanction of the anti-trust laws is clearly erroneous for two reasons. First, the commerce requirement is a jurisdictional requirement for federal courts tied to policies of federalism and says nothing about the validity of the trade practices involved. Thus, since the FCC has established jurisdiction over individual licensees, the jurisdictional requirement is not relevant and hence the Commission must look only to the substantive validity of the trade practices involved. Second, the FCC gives no reasoned basis for its conclusion, cites no evidence and in no way correlates the evidence with established guidelines in the area. *See* Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C.

383, 444 F.2d 841, 850–52 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

The one ambiguity in this record relating to RKO's violation of the anti-trust laws concerns the degree of market power necessary to make reciprocity illegal. There is some confusion in the cases, particularly when one refers to the tie-in cases, on whether some kind of market leverage must be shown to make reciprocity illegal. *Cf.* Turner, *Conglomerate Mergers and § 7 of the Clayton Act,* 78 Harv.L.Rev. 1313, 1386–93 (1965). This issue, while serious from my examination of the facts in this case, was not considered by the Commission. Since the case should be remanded under my view I think the Commission should explore the matter further with the aid of the Justice Department.

**60.** *See* National Broadcasting Co. v. United States, 319 U.S. 190, 222–24, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Philco Corp. v. FCC, 110 U.S.App.D.C. 387, 293 F.2d 864 (1961); Allentown Broadcasting Corp. v. FCC, 94 U.S.App. D.C. 353, 222 F.2d 781, 787, rev'd on other grounds, 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955); Mansfield Journal Co. v. FCC, 86 U.S.App.D.C. 102, 180 F.2d 28 (1950).

**61.** *See* RKO General, Inc., 44 F.C.C.2d 123, 143–44 (1973) (Lee, Comm'r, dissenting), *citing* FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940).

**62.** *See* RKO General, Inc., 44 F.C.C.2d 149, 172–73, 220 (1969) (Hearing Exam.). These statements of fact are not varied by the Commission's decision which only notes that RKO did not violate the NAB Code on advertising time. RKO General, Inc., 44 F.C.C.2d 123, 133 (1973). This statement is not supported by any reasons or evidence, both of which are necessary in light of the fact that RKO does not subscribe to the NAB Code and Fidelity's Exhibits 50–51, summarized in its brief at 88–89, purport to offer proof that RKO consistently violated the NAB Code provisions. RKO and the Commission respond in their briefs by essentially arguing that there are no standards by which to judge whether a licensee has engaged in overcommercialization. They are correct that the Commission has relied on a case-by-case inquiry, Commercial Practices of Broadcast Licensees, 36 F.C.C. 45 (1964), but this does not mean there are no standards at all. RKO seems to challenge the accuracy of Fidelity's information on commercialization in excess of the NAB Code (although the relevance of the Code is not explained); the Com-

reciprocal dealings in terms of the policies of the Federal Communications Act is manifest. And if one refers back to the strained arguments of the court and Commission on the diversification point, it is clear enough that economic concentration in both media and non-media areas should count very heavily against RKO if not provide a basis for disqualification. The Commission's failure to even weigh the issue at all in the comparative process is only one more indication that the Commission did not in fact engage in a comparative decision. And what are we to make of the court's statement that KHJ was only a small part of RKO's antitrust violations? This argument seems to support a conclusion opposite from that drawn by the court. The holding on this issue is truly extraordinary.

In terms of procedural unfairness to Fidelity, the preceding instances are unfortunately not exclusive. In its treatment of the programming issues suggested by Fidelity, the Commission continued to avoid a comparative evaluation through controversial procedural decisions.

## II. *The Commission Improperly Denied A Hearing on Fidelity's Specialized Programming Issue*

### A. *Fidelity's Petition to Enlarge Issues to Consider Programming*

A major factor motivating Fidelity's application for Channel 9 was its belief that communities in Orange County and southern Los Angeles do not receive sufficient attention from television stations in Los Angeles proper. The owners of Fidelity believed Channel 9 could be programmed in such a manner as to meet what they perceived to be the unfulfilled communications needs of the "Southland." Since programming issues will not be considered in a comparative hearing unless they are specifically set down

by the Commission,[63] Fidelity filed on June 27, 1966, a petition to enlarge the issues at the comparative hearing. The petition requested in the alternative that the Commission set down a § 307(b) issue in regard to the need of the Southland for an allocated television station or an issue as to Fidelity's "service philosophy", its desire to pay special attention to the needs of the Southland. Fidelity also requested a general programming issue on the basis of its allegations that it would devote substantially more time to news and local affairs than had RKO. This petition was accompanied by an extensive ascertainment survey of 1,200 community leaders and involving over 6,000 telephone calls and meetings with public officials and community organizations.

The Commission rejected the petition. Its finding on the § 307(b) issue is acceptable. I would also affirm its holding denying a general programming issue since Fidelity's petition alleged no facts in regard to the need for greater local or news programming *in general.* The Commission has since 1965 become increasingly strict about the relation of the ascertainment survey to general differences in percentage of news and local affairs programming because of its concern that applicants were engaging in "promise" battles to obtain a license.[64] As I will discuss in Part B below, there are First Amendment considerations which support this approach.

But I perceive no basis at all for the Commission's refusal to accord Fidelity a hearing on its "service philosophy" issue. Fidelity's "service philosophy" is merely a form of specialized programming designed to meet the alleged needs of an underserved portion of a particular service area. The Commission has granted a significant comparative preference on the basis of "service philosophy" in Central Coast Television, 35 F.C.C. 859

---

mission should forthrightly reconcile the disputes in the evidence and not rely on a mere conclusory statement, particularly in light of the fact that RKO does seem to admit to some commercialization in excess of the Code. *See* Brief for Intervenor RKO General, Inc. at 45.

**63.** Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 397–98 (1965).

**64.** *Id. See* Moline Television Corp., 31 F.C. C.2d 263, 272–73 (1971).

(1963), clearly the model for Fidelity's petition, and has granted comparative preferences on the basis of specialized programming in other cases.[65] This court in Citizens Committee to Save WEFM v. FCC, 165 U.S.App.D.C. 191, 506 F.2d 252 (1974) (en banc) reversed a Commission order denying a hearing into a specialized programming issue in a license assignment context and strongly indicated that the Commission could not ignore its responsibility to ensure a diversity of formats in a service area.[66]

The Commission's Review Board denied Fidelity's proposed "service philosophy" issue for these reasons. First, Fidelity has neither alleged nor shown that the Southland is more underserved than other parts of the service area. Second, Fidelity has not made "factual allegations" that it will not ignore the remainder of the service area. Third, there is no indication that the community leaders surveyed have sought and refused television time. Fourth, Fidelity has not shown a need for the programs directed to the Southland.[67]

The first three reasons are utterly devoid of rational content. What possible relevance is there in the fact that other areas of Los Angeles may be as underserved as the Southland? Such an argument defeats every specialized programming issue. The argument is implicitly rejected by WEFM. A similar point may be made about the third reason. Does the Commission seriously expect proponents of specialized programming to prove that their listeners have unsuccessfully sought other broadcasters to carry the specialized programming? And how can the Commission hold Fidelity to the actions of community leaders when those leaders expressly state that

there are local needs not being served by present communications outlets?

But the second "reason" deserves more scrutiny. Fidelity expressly states in its petition that if the § 307(b) issue is denied, it will serve the entire service area with particular attention to the needs of the Southland.[68] The Commission says this assertion is not backed by "factual allegations." What factual allegations does the Commission want? Even if some answer to this riddle would appear, and none does, at the very least the Commission should have requested further data (what data would be relevant, I do not know) or provided Fidelity with an opportunity to amend their petition after being informed of what facts the Commission thought were relevant. It must be remembered that Fidelity's petition seeks to merely obtain a hearing and that it offers proposed programming with the express allegation that the proposed programming will serve the entire service area. What more could the Commission want before ordering a hearing?

The court attempts to affirm this second reason by altering the Commission's rationale. Where the Commission had complained of a lack of factual allegations to support the contention that the entire service area would be covered, the court states that the Commission's decision is controlled by Petersburg Television Corp., 19 F.C.C. 451, 464–65 (1954). The court, noting a fact not mentioned by the Commission, states that Fidelity's list of interviewees contained only three interviews in Los Angeles proper; thus Fidelity "could . . . be found to have ignored the actual city of license in its planning" as was found in Petersburg. It is certainly true that the Commission does cite Petersburg for its hold-

**65.** See Citizens Comm. to Save WEFM v. FCC, 165 U.S.App.D.C. 191, 219, 506 F.2d 252, 280 & n.63 (1974) (Bazelon, C. J., concurring in the result) and authorities cited; authorities cited note 72 *infra.*

**66.** See 506 F.2d at 258–62, 265–66 & n.31 and authorities cited. See also Local 880, Retail Store Employees v. FCC, 141 U.S.App.D.C. 94, 436 F.2d 248 (1970).

**67.** See RKO General, Inc., 5 F.C.C.2d 517, 519–20 (1966), special relief denied, 8 F.C.C.2d 880, clarif. denied, 10 F.C.C.2d 115 (1967).

**68.** Petition to Enlarge Issues of Fidelity Television, Inc. at 11, Joint App. at 205, *citing* Petersburg Television Corp., 19 F.C.C. 451 (1954), aff'd Southside Virginia Telecasting Corp. v. FCC, 97 U.S.App.D.C. 130, 228 F.2d 644, cert. denied, 350 U.S. 1001, 76 S.Ct. 546, 100 L.Ed. 865 (1956).

ing—that a comparative demerit is awarded against an applicant who ignores a portion of its service area in formulating proposed programming—but it is equally clear that the Commission did not and could not have relied on that case to support its holding *sub judice* for the simple reason that the decision in *Petersburg* came *after a complete hearing into the programming issue.* The Commission in *Petersburg* found on the basis of one applicant's ascertainment survey, testimony and other evidence that the applicant ignored a portion of the service area in formulating its proposed programming. In this case, Fidelity's ascertainment survey was never introduced into evidence because no hearing was ever held. Fidelity was given no opportunity to contradict the court's factual finding about its intentions. Indeed, the court's citation of evidence ignores the fact that Fidelity also placed many thousands of telephone calls and sent many letters other than the interviews cited in its petition.[69] We do not know to whom those queries were directed because no hearing was ever held. The Commission, of course, avoided this issue by not, repeat not, referring to any inadequacies in Fidelity's ascertainment survey and instead simply stating that Fidelity had not made any factual allegations that it would in fact service the entire area. And, as I have argued, that

holding may not be sustained. The court's finding of fact, couched in terms of what "could have been found", is clearly erroneous.

I conclude that these first three reasons are largely make weight. The fourth reason is the more serious since it incorporates the Commission's policy of correlating ascertainment efforts with proposed programming in order to put down a programming issue. Apparently, the FCC's position was that the data stated in Fidelity's petition did not support its specialized programming proposal since the ascertainment survey did not identify any community problems or needs to which that programming would relate. The most cursory reading of Fidelity's petition indicates that it has offered substantial proof that little if any television programming in Los Angeles is directed to the local interests of the Southland. I do not understand the Commission to dispute this. Rather, the argument is that the ascertainment survey has no evidence on what those local interests are and why they require a telecommunications outlet. This requirement, as noted previously, originated in Commission attempts to control "promise" battles among applicants in regard to percentages of local affairs and news programming. Its rationale is seemingly not applicable in a "service philosophy" specialized programming issue since the

---

**69.** This was mentioned by the Hearing Examiner. *See* RKO General, Inc., 44 F.C.C.2d 149, 194, 224 (1969) (Hearing Exam.). *See also id.* at 195–199 (testimony supporting the specialized programming issue summarized). This fact is particularly crucial since Fidelity's petition was drawn with explicit reference to the *Petersburg* decision and sought to avoid the conclusion that it, Fidelity, like the unsuccessful applicant in *Petersburg*, meant to ignore part of the service area. *See* note 68 *supra.*

The court mistakenly informs us, 169 U.S.App.D.C. at page —— n.14, 515 F.2d at page 695 n.14, that the Hearing Examiner would have found against Fidelity on the service philosophy issue. This statement is remarkable for several reasons, the first of which being that the Hearing Examiner could not find against Fidelity on an issue which had never been heard and upon which no record had been developed. A second problem with the court's assertion is that it misstates the

Hearing Examiner's remark, which was that Fidelity's proposal might result in a further contribution to Los Angeles proper becoming "the hole in the doughnut of the surrounding communities." RKO General, Inc., 44 F.C.C.2d 149, 226 (1969) (Hearing Exam.). This remark is not a holding against Fidelity (and if it were, it might well be subject to challenge since no evidence is adduced in support of it and, of course, no hearing was held on the issue), but rather is one argument that counts against the specialized programming issue if in fact the specialized issue were to be used in the comparative hearing. It is noteworthy that this argument of the Hearing Examiner is directly inconsistent with the argument by the Commission that there is no evidence of any special local needs of the Southland to justify even hearing a specialized programming issue. RKO General, Inc., 5 F.C.C.2d 517, 519–20 (1966).

Commission would surely presume that a local community has *some* telecommunications needs.[70] The whole allocations policy of the FCC, based on the perhaps mythical concept of "local service", is premised on that view. The only issue then is whether the area to which the "service philosophy" is directed is in fact a distinct local community. After *WEFM* at least, I think the evidence in the ascertainment survey on the local interests of the Southland is sufficient to raise a substantial issue of fact on that question.[71] A review of Commission precedent in general on specialized programming hearings supports this conclusion.[72]

The court does not consider this issue of the relation of Fidelity's ascertainment survey to its specialized programming proposal, apparently content to rest its affirmance on the deficiencies it "finds" in Fidelity's survey even though that survey was not introduced in evidence and no hearing was held on it. The court does attempt to affirm a relat-

ed Commission decision to deny Fidelity an opportunity to amend its petition after the Commission reformulated its pleading standards for proposed programming issues in Chapman Radio & Television Co., 7 F.C.C.2d 213 (1967). The court advises us that since it has "found" Fidelity's ascertainment survey inadequate, Fidelity could gain nothing from revising its petition in light of *Chapman* since its original survey was thus inadequate.[73] The Commission did not take this approach, of course, because the ascertainment survey was not in the record. Rather it refused to permit Fidelity to revise its petition because it interpreted Fidelity's petition for reconsideration as declaiming any desire to amend the original petition and as nothing more than a restatement of its substantive argument that an issue should have been set down.[74] This conclusion, however, is no less extraordinary than the court's since why else would Fidelity seek relief after *Chapman* if it did not at least think it could amend its petition to

**70.** In fact, the Commission later assigned a UHF channel to Anaheim expressly to meet the local needs of the Southland. Table of Assignments, 8 F.C.C.2d 736 (1967). The Brief for the Federal Communications Comm'n at 19 & n.8 states that Fidelity should not be permitted to have a service philosophy issue until it had petitioned for rulemaking to modify the table of assignments. But any failure in that regard was surely cured by the Commission's own actions in granting an assignment to Anaheim. Moreover, the Commission in ruling on Fidelity's petition did not state that Fidelity had chosen the wrong procedure to obtain a service philosophy issue and that it should have sought rulemaking. Rather, the petition was dismissed because Fidelity had not alleged sufficient facts that there was separate local needs of the Southland distinct from the remainder of the Los Angeles service area. RKO General, Inc., 5 F.C.C.2d 517, 519–20 (1966).

**71.** *See* the evidence adduced and apparently accepted by the Hearing Examiner, summarized RKO General, Inc., 44 F.C.C.2d 149, 194–99 (1969).

**72.** *Compare* the analysis of Jimmie H. Howell, 46 F.C.C.2d 1150, 1153–54 (1973); Jay Sadow, 26 F.C.C.2d 940, 957–61 (1970); Harvit Broadcasting Corp., 18 F.C.C.2d 508 (1969); Jaco, Inc., 18 F.C.C.2d 219 (1969); Christian Broadcasting Ass'n, 16 F.C.C.2d 594 (1969); Salter

Broadcasting Co., 8 F.C.C.2d 1036 (1967); Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 397 n.9 (1965); *cf.* La Fiesta Broadcasting Co., 6 F.C.C.2d 65, 67–74 (1966) *with* the following general service cases, Community Broadcasters, Inc., 33 F.C.C.2d 714, 719, 720 (1972); WSOQ, Inc., 20 F.C.C.2d 874, 875–76 (1969); City of Camden, 18 F.C.C.2d 412 (1969); Regal Broadcasting Corp., 14 F.C.C.2d 845, 847 (1968). *See also* Citizens Comm. to Save WEFM v. FCC, 165 U.S. App.D.C. 191, 219, 506 F.2d 252, 280 & n.63 (1974) (Bazelon, C. J., concurring in the result) and authorities cited.

**73.** 169 U.S.App.D.C. at page —— n.16, 515 F.2d at page 696 n.16. The court may at this point be only referring to the general programming issue proposed by Fidelity.

**74.** RKO General, Inc., 8 F.C.C.2d 880 (1967), clarif. denied, 10 F.C.C.2d 115, 117 (1967). It was in this last decision by the Review Board denying clarification of the Commission's action that the inadequacy of Fidelity's ascertainment issue was first raised. In mentioning this alleged inadequacy (after all the ascertainment survey was never in the record), the Review Board refers to previous "findings" of inadequacy. The Review Board provides no citation to such previous "findings" and there are none in its previous decision on the specialized programming issue. *See* RKO General, Inc., 5 F.C.C.2d 517, 519–20 (1966).

conform with *Chapman* and since Fidelity could not have complied with *Chapman* as that decision was not issued until after Fidelity's original petition was denied. So, the Commission changes the law on allegations of ascertainment and denies Fidelity a chance to comply because it assumes that Fidelity is not really able to comply. This reasoning does little to command our respect. I conclude that at the very least Fidelity should have been given an opportunity to revise its petition in light of *Chapman*.

B. *First Amendment Implications of Consideration of Program Content*

Consideration of Fidelity's proposed specialized programming issue and also of RKO's past performance in programming Channel 9 in making a comparative decision raises significant First Amendment problems. I have discussed those problems at length previously [75] and intend here to only outline the tentative conclusions I have reached. The FCC may in a comparative hearing consider whether a particular programming proposal will meet an unfulfilled community need and hence increase the overall diversity of programming in the viewing market. I take this to be a rather limited examination of program content and one which is consistent with Fidelity's specialized programming proposal. As I

indicated previously, I am not comfortable with this conclusion but perceive no other possible result considering the present system of broadcast regulation.[76]

Far more difficult problems are encountered when one turns to the Commission's scrutiny of RKO's past programming. In this case, RKO was awarded neither a preference, or renewal expectancy nor a demerit because of its past programming. Fidelity vigorously challenges this conclusion, arguing that the evidence indicates that RKO should have been given a substantial demerit for past programming. This evidence tends to prove that RKO programmed very little news or local affairs, engaged in excessive commercialization and largely utilized old movies dealing with crime and violence.[77] I have no difficulty with a consideration of excessive commercialization in the decision whether to grant a renewal expectancy or a demerit.[78] As for the remainder of RKO's past programming, I am constrained to hold that the Commission may award a preference or demerit on the basis of a significant amount of actual journalism by the licensee without regard to the content of that journalism. I think this holding may be premised on those decisions erecting a Fairness obligation to report on controversial issues of public importance.[79] I am not pres-

**75.** *See* Citizens Comm. to Save WEFM v. FCC, 165 U.S.App.D.C. 191, 207, 506 F.2d 252, 268 (1974) (Bazelon, C. J., concurring in the result).

**76.** *Id.* at 281–83. *See generally* Bazelon, *supra* note 31.

**77.** *See* RKO General, Inc., 44 F.C.C.2d 149, 161–88 (1969) (Hearing Exam.) which collects most of the evidence Fidelity thinks is relevant to a determination on RKO's past performance. On the commercialization issue, *see* note 62 *supra*.

**78.** *See* Citizens Comm. to Save WEFM v. FCC, 165 U.S.App.D.C. 191, 216, 506 F.2d 252, 277 & n.40 (1974) (Bazelon, C. J., concurring in the result); Bazelon, *supra* note 31, at 229–34. It is not clear what the Commission found on commercialization but it does appear that the Commission did *not* award a comparative

demerit or in any manner weigh overcommercialization against RKO.

**79.** *See* Public Communications, Inc., 32 P & F Radio Reg.2d 319 (1974); Editorializing by Broadcast Licensees, 13 F.C.C. 1246, 1249–51 (1949). *Cf.* Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 860 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971) (on the "editorializing" part of the journalistic function).

Of course, in enforcing such a standard of significant amounts of journalism the Commission should require strict requirements of pleading to ensure that percentage differences in programming among applicants truly relate to community needs. These pleading requirements will protect applicants from the chilling effect of amorphous and unsubstantiated challenges and the costs incident to defense thereof. *See* National Broadcasting Co. v. FCC, 170 U.S.App.D.C. ——, at ——, 516 F.2d 1101 at 1156 (1975) (Bazelon, C. J., dissenting from the order

ently informed, however, of any justification for review of the content of entertainment programming. Absent further explanation from the Commission, I would not think it proper to award a preference or a demerit on that basis. Since the Commission's decision is unclear on this point, I would remand for further consideration.[80] On the remand, the Commission could, of course, consider the extent to which RKO's entertainment programming meets unfulfilled community needs and hence contributes to overall diversity in making a comparative evaluation. Any renewal expectancies would of necessity be generated by this process of comparison. I realize this is an imperfect approach to the problem of permissible renewal expectancies; perhaps much more inclusive consideration of program content is required in order to securely grant a significant renewal expectancy. I simply do not know of any other approach. The Commission presently has the matter under advisement in a rulemaking proceeding.[81] Perhaps it will provide us with some guidance in this difficult area. For the time being, I think this case should be remanded on the programming issue.

### III. *Conclusion*

Former Commissioner Johnson, dissenting, stated that the "decision, granting RKO's renewal application for KHJ–TV in Los Angeles, may very well be the worst decision of this Commission during my term of seven years and five months."[82] Despite the intense competition for this honor, I am constrained to agree. The decision is so bad not because the Commission's substantive holding is wrong—although I have little doubt that it is—but because the fiercely technical and mechanical treatment of Fidelity's meritorious claims and the pervasive result-oriented reasoning completely strip off any veneer of rationality attaching to the comparative licensing decision. There is only one operative part of the Commission's decision. I quote it in full: "IT IS ORDERED: (d) That the application of RKO General, Inc. for renewal of license . . . IS DEEMED TO BE GRANTED . . ."[83] The rest of the opinion is superfluous. It is wholly appropriate that the deciding vote was cast by Chairman Burch who simply concurred in the result. It would be easy to be alarmist about this decision, but I suppose that would be unwarranted. The same ability to bulldoze through administrative precedent that marks this case for unwanted distinction will be, I am sure, turned against the case itself. Perhaps it is this capacity for forgetfulness that enables the Commission to motor right along while I remain baffled and amazed at the turn of events in these comparative cases. I suppose I am naive to expect anything different.

But I remain curious as to why the court labors so valiantly to affirm this

vacating the previous order granting rehearing *en banc*). The Commission at present recognizes such pleading requirements. *See* Chapman Radio & Television Co., 7 F.C.C.2d 213 (1967); 169 U.S.App.D.C. —— & n.64, 515 F.2d 721 & n.64 *supra*.

80. *See* Citizens Comm. to Keep Progressive Rock v. FCC, 156 U.S.App.D.C. 16, 478 F.2d 926, 929 (1973); Network Programming Inquiry, 20 P & F Radio Reg. 1901, 1907 (1960). The Hearing Examiner clearly weighed the alleged lack of "quality" in RKO's programming, RKO General, Inc., 44 F.C.C.2d 149, 162–69, 177–88 (1969), but the Commission stated that it would not consider "quality" even though it also concluded that RKO's past performance was merely "average" (a conclusion which seems to indicate some quality judgment), 44 F.C.C.2d at 132–33.

81. Formulation of Policies Relating to the Broadcast Renewal Applicant, 27 F.C.C.2d 580 (1971), amended, 31 F.C.C.2d 443 (1971), mandamus denied, Citizens Communication Center v. FCC, 149 U.S.App.D.C. 419, 463 F.2d 822 (1972).

82. RKO General, Inc., 44 F.C.C.2d 123, 140 (1973) (Johnson, Comm'r, dissenting).

83. *Id.* at 138. But the Commission even vacillated on this issue, later arguing that its decision was not a final order. Fidelity Television, Inc. v. FCC, 163 U.S.App.D.C. 441, 502 F.2d 443 (1974).

"foolish piece of business." The irrationality of the comparative hearing process has certainly been publicized enough by quite moderate observers.[84] Perhaps the court is of the opinion that this is not the "right case" to correct the irrationality of the comparative hearing process. The court's "clarification" of its original opinion suggests as much by repeated references to what it obviously has concluded are Fidelity's weaknesses as a licensee. The central weaknesses that the court perceives are that doubts have been raised as to Fidelity's candor and that its "service philosophy" is really an "artificial construct." I never would have believed the court would be so unfair to a litigant before it. Both of these points were *not in issue before the FCC since the Commission expressly refused to put down an issue as to each.* With absolutely no record on the candor of Fidelity or the *bona fides* of its specialized programming proposal, the court leaps to extraordinary conclusions. The "service philosophy" issue was patterned directly on a prior Commission decision. We may disagree on whether it fits the pattern, although there never was a hearing to find out, but to name it an "artificial construct" requires more righteousness and certitude than I can summon. The candor issue pertains to Fidelity's alleged failure to inform the Commission that some of its stock subscription agreements were signed by agents of the subscriber; and Fidelity's alleged failure to inform the Commission of certain changes made in its corporate structure. We have nothing, absolutely nothing, in this record to indicate that either existed or that they were more than technical or clerical errors. The fact that the Commission refused to set down an issue on the point certainly tells us something about the substantiality of the court's new found candor issue.

The court also points to the Hearing Examiner's colorful language describing Fidelity's lack of experience in broadcasting. No financial issue was put down against Fidelity. As I indicated previously, if lack of experience is a disqualification—and the Commission certainly did not, repeat did not, suggest that it was even a demerit—we might as well do away with the diversification guides. Let the networks own all the licenses; they have proven experience. The Hearing Examiner's penchant for hyperbole on the integration factor obscures the modesty of Fidelity's proposal and the express statement in the 1965 Policy Statement that past experience is not all that significant in weighing the integration factor. And, of course, the Commission took a completely different tack than did the Hearing Examiner in arguing that the integration proposal of Fidelity could not be implemented. The Hearing Examiner's rhetoric has absolutely no decisional significance. And all the court's enthusiasm for the Hearing Examiner obscures the fact that the Examiner recommended that the license be *granted to Fidelity.*

The court's characterization of Fidelity as a "nothing" applicant constitutes apparently a flailing effort to avoid what is clearly a dangerous precedent in comparative hearings. The ironic truth is that the court need not clutch at such straws since we can be sure the Commission will manage to erect some ethereal distinction of this case that will prevent it from becoming a precedent in non-renewal comparative cases. But the court's characterization of Fidelity as a "nothing" applicant raises the question in my mind as to what the court would desire from a "something" applicant. Here Fidelity has an important diversification advantage which it seeks to translate into a specialized programming proposal; it seeks to modestly integrate ownership into management and is locally owned. It appears to me that this is exactly the kind of application which we should find to be "something" indeed, a truly new voice in the highly concentrat-

---

84. *See* Geller, *A Modest Proposal for Modest Reform of the Federal Communications Commission,* 63 Geo.L.J. 705, 715–18 (1975) and leading authorities cited which include Professor Jaffe, Judge Friendly, Professor Jones and a member of the panel that decided this case.

ed telecommunications industry. Apparently the court requires experience in order for the applicant to be "something" but as I have said again and again in this statement and elsewhere, primary emphasis on past experience will forestall new entrants into the broadcasting field. And as we have said before, prior broadcast experience unlike concentration of control is remedial.[85] Perhaps the importance of Fidelity's application would be more apparent to the court if Fidelity had included members of minority groups among its stockholders.[86] The court seems antagonistic to Fidelity because its proposals promise much, as if the very making of a promise is suspect, a mere ploy to swipe an incumbent's license. But Fidelity has no alternative but to promise since it is a newcomer. Once more the court seems to place an excessive premium on past broadcast experience.

Perhaps what makes the court's opinion so difficult for me is the realization that this debate between diversification and past experience is a repetition of a battle I thought had been fought and won long ago. In 1958, seventeen years past, I criticized the Commission thus:[87]

> I think that by . . . attributing to these by-products of concentration [e. g. past experience] a greater degree of importance than it attributes to the traditional, and antipodal, preference for decentralization of ownership of the mass media of communication, the Commission has effectively nullified the diversification and anti-monopoly policy long since recognized as 'one of the basic underlying considerations in the enactment of the Communications Act.'

There may be cases in which the Commission can properly find that experience resulting from an applicant's ownership of communications facilities offsets a competing applicant's freedom from ownership of other communication interests. But 'Commission expertise alone cannot support so pivotal (a divergence)' from basic communications philosophy. A convincing explanation is required.

I do not think either the court or the Commission offers such an explanation. Rather we are regaled with all the advantages of experience and all the advantages of diversification are quietly but securely swept under the rug.

As with the last battle, this repetition of it will be won or lost by future appointments to the Federal Communications Commission and whether those appointments arrive, like those in the early 1960's, with a desire to reduce the concentration of control of the telecommunications industry. But what do we say to the owners of Fidelity in the meantime?

This question is not merely personal. Reliance on judicial techniques of reasoned judgment lends to the comparative decision process an expectation of rationality and predictability. Perhaps naively, the owners of Fidelity relied on that expectation and spent a good deal of money in the process of that reliance. Fidelity, too, is entitled to its "challenge expectancies" of a fair and rational comparative process. I simply cannot believe that serious students of communications policy would conclude that expectation has been fulfilled in this case.

This injustice leads me to further question whether we ought not give up the pretense that the comparative evalu-

---

**85.** Sunbeam Television Corp. v. FCC, 100 U.S. App.D.C. 82, 243 F.2d 26, 29 n.6 (1957).

**86.** *Compare* Garrett v. FCC, 168 U.S. App.D.C. 266, 513 F.2d 1056 (1975); TV 9, Inc. v. FCC, 161 U.S.App.D.C. 349, 495 F.2d 929 (1973), cert. denied, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974).

**87.** Tennessee Television, Inc. v. FCC, 104 U.S. App.D.C. 316, 262 F.2d 28, 32–33 (1958) (Ba-

zelon, J. dissenting). *See also* Pinellas Broadcasting Co. v. FCC, 97 U.S.App.D.C. 236, 230 F.2d 204, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956). The arguments in my dissents in these two cases were seemingly adopted by the Commission in its Policy Statement on Comparative Broadcast Hearings, 5 F.C.C.2d 393, 394–95 (1965); *see* Terre Haute Broadcasting Corp., 25 F.C.C.2d 348, 353–55 (1970); sources cited notes 35, 38 *supra*.

ation is a rational process but is instead a "legislative" type decision which may be made on the basis of any reasons or no reasons, perceived dimly or not at all by the decision-maker.[88] If we fail to take this approach and yet continue to affirm cases such as the one *sub judice,* we will only be leaning together the shards of a rotten building through the legitimation of appellate review. If we adopt an approach more compatible with the Commission's present posture and give up the illusion of serious appellate review, we will at least be aware of the choices we face in this difficult area of policy, implicating both the values of protection of small business and free enterprise in a competitive system.[89] And we will thereby displace any expectations of rationality possibly held by challengers and renewal applicants alike. Any other approach may give us the illusion that all is well, that the choices may be handled within the present rational structure, when in fact we know, from this case at least, that no such rational structure exists.

88. Pinellas Broadcasting Co. v. FCC, 97 U.S. App.D.C. 236, 230 F.2d 204, 206, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956) (Prettyman, J.):

The decisive factors in comparable [sic] selections may well vary . . . And it is also true that the Commission's view of what is best in the public interest may change from time to time. Commissions themselves change, underlying philosophies differ, and experience often dictates changes. . . . All such matters are for the Congress and the executive and their agencies. They are political, in the high sense of that abused term. They are not for the judiciary.

89. *Compare* Carroll Broadcasting Co. v. FCC, 103 U.S.App.D.C. 346, 258 F.2d 440 (1958) *with* 169 U.S.App.D.C. pages ——–——, 515 F.2d pages 711–717, *supra.*